## THOMAS *against* CROSWELL.

*To publish of a member of congress, "he is a fawning sycophant, a misrepresentative in congress, and a grovelling office-seeker, he has abandoned his post in congress, in pursuit of an office," is libellous.*

*And whether the person so libelled, did leave his post, for the purpose imputed to him, or had violated his duty as a representative in congress, are questions for the jury to decide.*

*Whether publications by the defendant against the plaintiff, subsequent to the libel charged in the declaration, and which are in themselves libellous, can be admitted in evidence to show the malice of the defendant in publishing the original libel? Quære.*

*Though a person may publish a correct account of the proceedings in a court of justice, yet if he discolours or garbles the proceedings, or adds comments and insinuations of his own in order to asperse the character of the parties concerned, it is libellous.*

THIS was an action for a libel, published in a gazette, called "*The Republican Crisis.*" The cause was tried at the *Washington* circuit, in *June*, 1810, before Mr. Justice *Van Ness*.

The libel set forth in the declaration was as follows: " On *Friday* last the legislature appointed a new treasurer, in the room of Mr. *L.* who has filled the office for several years, and performed the duties with perfect fidelity and ability. This measure had been determined on from the moment Mr. *L.* took the liberty of exercising the right of a freeman, in supporting such a candidate for governor as he deemed most suitable to fill the office. From that moment too, a fawning sycophant, by the name of *David Thomas*, (a misrepresentative in congress, and a major-general by commission,) had fixed his eye upon the office. Accordingly, when the legislature of the session was about

commencing, this Mr. *Thomas* abandoned his post in con-

gress, and made, his appearance in *Albany.* The object of his visit was not left to conjecture, for he openly avowed it. Under the circumstances, it was hoped Mr. *Thomas* would not succeed. It was hoped that the legislature would frown this creeping sycophant, this grovelling office-seeker, back to his duty at *Washington;* that they would spurn at his impudent attempt at reaching after blessings. But the hope of his disappointment did not rest on this ground alone. Doubts existed both as to his ability and his integrity. We are told that letters were circulated among the members of the legislature previous to taking the question on the appointment, in which it was stated, that this *David Thomas,* a few years since, was indicted by a grand jury of *Washington* county, for receiving a quantity of counterfeit money, with intent to pass it. That on his trial, before the *petit* jury, one witness expressly swore to the fact; but this witness being an accomplice, his testimony was not deemed sufficient to convict the accused, and on this ground alone he was acquitted."

The publication of the libel, on the 2d *February,* 1808, by the defendant, was proved; and it was admitted, that the paper in which it was published had extensive circulation, and that the libel referred to the plaintiff.

The defendant read in evidence a record of the indictment, trial, and acquittal of the plaintiff, by which it appeared that the plaintiff was indicted at a court of *oyer* and *terminer,* held in *Washington* county, in the year 1797, for knowingly receiving certain counterfeit bank bills from one *Samuel A. Gibbs,* with intent to pass them; on which indictment he was tried and acquitted by the jury.

The defendant then called several witnesses to show what took place at that trial. It appeared that *Gibbs* and some others, his associates, had been apprehended for passing *counterfeit bills,* and were confined in gaol in *Washington* county; and *Gibbs* sent for the plaintiff, (who was the only acting magistrate in *Salem,* where *Gibbs* was confined,) for

the purpose of making some disclosures. The gaoler was called out of the room and left the plaintiff with *Gibbs*, but returned in less than two minutes, and, in the opinion of the gaoler, who was a witness, it was not possible for *Gibbs* to have delivered the bills, as he pretended, to the plaintiff, during the absence of the witness. A witness proved, that *Gibbs* had said " he would send the plaintiff to the state prison, if he should roast in hell for doing it ;" and several other witnesses also testified to similar declarations of *Gibbs*, to show his malice against the plaintiff, and it was proved that he was a person of bad reputation, and destitute of veracity. *Gibbs* was the only witness on the trial of the plaintiff on the indictment.

Two newspapers entitled " *The Republican Crisis*," one dated the 16th *February*, and the other the 22d *July*, 1808, and also two papers called " *The Balance*," dated the 2d and 13th *June*, 1809, published by the defendant, were offered in evidence to show the malice of the defendant against the plaintiff. The defendant's counsel objected to reading any papers in evidence, which had been published since the commencement of this suit, but the objection was overruled by the judge. The first two papers were then proved to have been printed at the press of the defendant; and no objection being made for want of proving that the other two papers were also printed by the defendant, the whole were read in evidence.

It was proved that the plaintiff was a member of congress in the winter of 1808, when congress was in session, and that he came from *Albany* to *Washington* a short time before he was appointed treasurer of this state, and was in *Albany* at the time of his appointment, and immediately after entered on the execution of the duties of his office, and did not return again to *Washington ;* and that a paper containing the charge against the plaintiff as to the indictment, &c. was circulated and delivered to several members of the assembly, on the morning of the day of his appointment, and previous to the passage of the bill for that purpose.

The judge charged the jury, that the charges of sycophancy, grovelling office-seeking, and misrepresentative in congress, were clearly libellous; but if the jury believed that the plaintiff had abandoned his post in congress in pursuit of the office of treasurer, and that such abandonment of his place, was a violation of his duty as a member of the house of representatives, the charges were substantially supported, and that it was not necessary for the defendant to prove them literally true. As to the other part of the libel, he observed, that it was undoubtedly true that the defendant had a right to publish a correct statement of the indictment against the plaintiff, and of his trial and acquittal; yet, when he undertook to make such publication, it was his duty to give a true statement. That the defendant, in this case, put the plaintiff's acquittal solely on the ground, that *Gibbs*, the only witness who testified against him, stood in the light of an accomplice, when, according to the evidence, it appeared that his credit was otherwise materially impeached. His honour was, therefore, of opinion, that the plaintiff was entitled to recover, though he did not think the *innuendoes* in the plaintiff's declaration were warranted by a true construction of the libel; but that the jury had a right to judge, taking into consideration the whole libel and the evidence, whether it was the intention of the defendant to charge the plaintiff with being guilty of the crime for which he had been indicted. That if they found a verdict for the plaintiff, they ought to give him such damages as, under all circumstances, they should think him entitled to receive. The jury found a verdict for 400 dollars damages.

A motion was made to set aside the verdict and for a new trial.

*Z. R. Shepherd* and *Van Vechten*, for the defendant. 1. The admission in evidence of newspapers published after the alleged libel, and subsequent to this action, was im-

NEW-YORK,
Nov. 1810.

THOMAS
v.
CROSWELL.

proper. It may be said that they were admitted merely to show the intention or malice of the defendant. But malice or evil intention is the very essence of a libel, and evidence of malice furnishes ground to the jury to enhance the damages. If the subsequent publications prove the malice of the defendant, and aggravated damages are given on account of the supposed malignity of the author, the plaintiff will recover damages also for the subsequent publications, though not libellous.

But, publications since the commencement of the action cannot show the intention of the defendant in publishing the original libel; for the last publication may have been provoked or justified by the subsequent conduct of the plaintiff. Such evidence is irrelevant, and ought not to be admitted to prejudice the defendant. The subsequent publications, if examined, will not justify any inference of malice; and it was improper to permit them to have any influence with the jury, so as to enhance the damages.

Again, the plaintiff must state his complaint specifically, so that the defendant may come prepared to meet it; but how can he be supposed to be prepared to meet subsequent publications not stated in the declaration. In *Mead* v. *Daubigny*,* Lord *Ellenborough* refused to admit evidence of other words spoken by the defendant, as were in themselves actionable, being clearly of opinion that such evidence was not admissible.

2. The judge misdirected the jury. He should not have left it to them to decide whether the plaintiff, by leaving congress, had violated his duty. Again, the defendant is not liable to an action for publishing a correct statement of what took place at the trial of the plaintiff ;† and if the substantial fact is justified, the *innuendoes* in the declaration were immaterial. The *innuendoes* are not warranted by the context; the jury ought, therefore, to have been directed to find for the defendant.

The publication was substantially true; its object was to animadvert on the legislature; there was no evidence of malice towards the plaintiff.

* *Peake's N. P.* 125. But see *Peake's N. P.* 166. 22.

† 2 *Burr.* 807. 3 *Term Rep.* 293. 1 *Bos. & Pull.* 525.

*J. Russell* and *Skinner*, contra. 1. There are numerous decisions which show that other papers, libellous as well as not libellous, published after as well as before the action, may be given in evidence to show the intention of the defendant, or *quo animo* he spoke the words or published the libel; though the jury must give damages only for the libel charged in the plaintiff's declaration. This doctrine was laid down by Lord *Kenyon*, in *Mead* v. *Daubigny*,* and *Lee* v. *Huson*,† and by Lord *Ellenborough*, in *Plunkett* v. *Cobbett*,‡ and *Rustell* v. *Maquister*.§ . The evidence is not admitted to increase the damages, but merely to prove the fact of publication, or the intention of the defendant.

* *Peake's N. P. Cases*, 125.
† *Ibid.* 166. See also *Peake*, 22.
‡ *Selwyn's N. P.* 931.
§ 1 *Campb. N. P.* 49. *note.*

2. To decide whether the judge was correct in stating to the jury that the plaintiff was entitled to recover, the court must determine on what is the true construction of the libel. In the case of *Stiles* v. *Nokes*,¶ it was held libellous to publish a highly coloured account of judicial proceedings, interwoven with the party's own comments, conclusions and insinuations.

¶ 7 *East*, 493.

If the *innuendoes* are not pertinent or material, they may be rejected as surplusage.** The truth or falsehood of *innuendoes*, is matter of fact for the consideration of the jury.††

** 9 *East*, 93.

†† 3 *Term Rep.* 428.

SPENCER, J. delivered the opinion of the court. The grounds taken in support of the motion for a new trial, are, 1. That newspapers published after the libel, were admitted in evidence, and without being proved to have been published by the defendant; 2. For the misdirection of the judge; 3. Because the verdict was against evidence.

The papers supposed to have been improperly admitted in evidence were two newspapers, entitled "*The Republican Crisis*," of the 16th of *February* and 22d *July*, 1808. The libel was published in a paper of that title of the 2d of *February*, 1808, and that paper, it was admitted, was published by the defendant, and it was also admitted that he was the

editor and publisher of that paper from the 20th of *January* to the 1st of *December*, 1808. It was proved by *Reynolds*, a printer, that on comparing the papers of the 16th of *February* and 22d of *July*, with the one containing the libel, they were printed at the same press. This evidence proved the defendant to have been the printer of the two papers objected to, in as full a manner as was necessary. The papers, " *Albany Balance, and .New-York State Journal,*" of the 2d and 13th *June*, 1809, were not objected to, as the case states, for want of proving that they were printed by the defendant.

The question, then, is, was it proper to give in evidence publications made after the libel. It has not been objected that they were libellous; and the plaintiff's counsel put their right to reading them on the ground that they afforded evidence of the defendant's malice in the original publication. The *nisi prius* decisions on this point are somewhat contradictory. All of them agree that in actions for written or verbal slander, other and posterior publications or words, not actionable, may be given in evidence to show malice. In *Rustell* v. *Maquister*, (1 *Campb. N. P.* 48. *in the notes*,) Lord *Ellenborough* said, that although there had been formerly such a distinction, it was not founded on any principle; that any words, as well as any act of the defendant, may be given in evidence to show *quo animo* he spoke the words; but that the judge should tell the jury to give damages only for the words which were the subject of the action.

In *Mead* and *Daubigny*, (*Peake's N. P.* 126.) and *Cook* v. *Field*, (3 *Esp. N. P. Cas.* 33.) Lord *Kenyon* refused to permit words actionable, spoken afterwards, to be given in evidence. But in *Lee* v. *Huson*, (*Peake*, 166.) in an action for a libel, the same judge suffered other libellous papers to be given in evidence.

Perhaps this is not the occasion to lay down any rule on the subject, it not being necessary to this case, nor do the court mean to do it. But I should think it incorrect to

suffer distinct libellous matter to be given in evidence ; for
though the judge might instruct the jury not to give da-
mages for such libels, yet it would imperceptibly influence
their judgments as to the damages, and thus the defendant
might be twice punished for the same offence.

On the point of misdirection, the judges charge is object-
ed to in three respects ; 1. In leaving a question of law to
the jury, whether the plaintiff had violated his duty in
leaving *Washington* and soliciting the office of treasurer ;
2. That the *innuendoes* give a sense not warranted by the
context in this, that the libel did not amount to the charge
that the plaintiff was guilty of the crime of receiving a quan-
tity of counterfeit money, with intent to pass the same know-
ing it to be counterfeit, and that on this ground the judge
ought to have charged the jury to find for the defendant ;
3. That the defendant's publication of the plaintiff's
trial was substantially true ; that its object was to animad-
vert on the legislature, and therefore it ought to have been
submitted to the jury whether there was malice in the de-
fendant towards the plaintiff, as evidenced by the libel.

It must be a matter of fact whether the plaintiff's leaving
*Washington* and coming to *Albany*, for the office of treasu-
rer, (if he did so,) was or was not a violation of duty ; and
this would depend upon the circumstance whether he had
leave of congress to absent himself or not. Unexplained,
it is to be presumed that he had such permission. It can-
not be pretended that a member of congress is so far bound
to yield his personal attendance, that absence, with leave
of the body to which he belongs, is a violation of duty.
Congress have a right to enforce the attendance of members,
and they have a right to dispense with such attendance. Con-
gress are the judges, and no man is obnoxious to the charge
of abandoning his duty there, who leaves it by permission ;
but this question is at rest by the verdict of the jury.

An *innuendo*, as has been often decided, cannot add or
enlarge, extend or change the sense of the previous words ;
and the matter to which it alludes must always appear from

the antecedent parts of the declaration; but when the new matter stated in an *innuendo* is not necessary to support the action, it may be rejected as surplusage. (1 *Chitty*, 383, 9 *East*, 93. *Roberts* v. *Camden*.)

The judge admitted the defendant's right to publish a correct account of the plaintiff's trial, but limited this right to the publication of a true history of it; and he stated, that the defendant had put the plaintiff's acquittal solely on the ground, that *Gibbs*, the only witness, stood in the light of an accomplice, when it appeared that his credit was otherwise materially impeached, and that on this ground the plaintiff was entitled to recover.

There is not a *dictum* to be met with in the books, that a man, under the pretence of publishing the proceedings of a court of justice, may discolour and garble the proceedings by his own comments and constructions, so as to effect the purpose of aspersing the characters of those concerned. In the case of *Stiles* v. *Nokes*, (7 *East*, 493.) the court laid down the true distinction; and whilst they admitted that a fair account of judicial proceedings might be published with impunity, they held that the writer could not introduce his own comments, insinuating the commission of perjury. It is impossible to read the libel in this case, without understanding that the defendant meant to insinuate that the plaintiff had received the counterfeit money with intent to pass it. But it is said that the animadversion was not on the plaintiff, but on the legislature, for appointing the plaintiff treasurer without investigation. How was the legislature blamable for making the appointment, unless the indictment and trial of the plaintiff, as published by the defendant, held up the plaintiff as probably guilty, notwithstanding his trial and acquittal? If the only witness stated himself to be an accomplice, and was otherwise totally discredited, from the infamy of his character, and his malice towards the plaintiff, (and on these grounds the plaintiff was acquitted,) what investigation was to be made? I am perfectly satisfied that the libel contains a highly coloured ac-

count of the proceedings, that it suppresses, for bad purposes, material facts, and that it conveys insinuations of the plaintiff's guilt, unauthorized by the trial and the facts which transpired at the time of the trial; and if so, the inference of malice was inevitable.

These remarks have anticipated the last point raised, that the verdict was against evidence. I will only add, that the verdict was, in my opinion, perfectly correct.

Motion denied.