ALPHEUS WINCHELL, Appellant, v. THE ARGUS COMPANY, Respondent.

*Libel and slander distinguished — words actionable* per se *if printed, not so if merely spoken — the imputation of a crime not essential to a libel.*

Words which tend to diminish the respectability of the person to whom they relate, and to expose him to disgrace and obloquy, although they do not impute the commission of a crime, and would not be actionable *per se* if merely spoken, are, when printed and published, libelous and actionable, although no special damages are alleged or proved.

APPEAL by the plaintiff, Alpheus Winchell, from a judgment of the Supreme Court, in favor of the defendant, entered in the office of the clerk of Saratoga county on the 26th day of October, 1892, upon the dismissal of the complaint on the opening of the case at the Saratoga Circuit.

*Egbert Price*, for the appellant.

*John A. Delehanty*, for the respondent.

MAYHAM, P. J. :

This is an appeal from a judgment entered upon the order of the trial judge, dismissing the plaintiff's complaint at the trial, on the ground that it does not state facts sufficient to constitute a cause of action.

The action is for libel, and the complaint charged that the defendant published in the *Argus*, a newspaper printed in Albany, the following alleged libelous words of and concerning him :

" A lazy brute, lives in idleness and lets his family starve.
                                  " SARATOGA SPRINGS, *Feb.* 19.

" E. D. Selden, Superintendent of the Saratoga Humane Society, is investigating charges made against Alpheus Winchell (meaning plaintiff), of North Milton, who resides on the farm of his father-in-law, Henry Traver, of Milton. Winchell (meaning plaintiff) is an indolent fellow, and last summer did not raise any grain or vegetables on his (meaning plaintiff's) farm, nor cut any hay, and consequently this winter his family (meaning plaintiff's family) of a wife and six children are suffering for food, and his horses, cattle and swine (meaning plaintiff's horses, cattle and swine) are not properly fed," by which false, scandalous and defamatory words the defendant meant and was understood to mean that the plaintiff was lazy and would not work, and that plaintiff did not provide necessary food for his family, and was guilty of the crime of being a disorderly person, and also that plaintiff did not provide necessary food for his horses, cattle and swine, and that he was guilty of the crime of cruelty to animals.

V. That said libel also contained in another part thereof the several other false, scandalous, malicious and defamatory words and matter following, of and concerning the plaintiff, that is to say :

"After his neighbors (meaning plaintiff's neighbors) had contributed from their stock of hay, etc., either willingly or unwillingly, they (meaning plaintiff's neighbors) locked their barns and granaries against him (meaning plaintiff) and entered complaint to Superintendent Selden, who found on driving out to Winchell's place (meaning plaintiff's place) that the complaints were in no sense exaggerated," by which false, scandalous and defamatory words the defendant meant and was understood to mean that plaintiff was a thief, and also that plaintiff was guilty of the crime of larceny, and that plaintiff had taken hay, etc., from his said neighbors without their consent.

VI. That said libel also contained in another part thereof the several other false, scandalous, malicious and defamatory words and matter following, of and concerning the plaintiff, that is to say : " He (meaning Superintendent Selden) has brought the matter to the attention of Police Justice Burnham, of Milton, at Ballston Spa. One of the farmer's wives residing in the vicinity (meaning the vicinity of plaintiff's place) told Mr. Selden that recently, wishing to contribute to the necessities of the Winchell children (meaning plaintiff's children), she (meaning the neighbor's wife) carried some provisions to his house (meaning plaintiff's house), and just as she was about to divide it among them (meaning the children) the unnatural father (meaning plaintiff) came into the house and saying : 'that is good,' picked up and devoured the food in her presence," by which false, scandalous and defamatory words the defendant meant and was understood to mean, that plaintiff had been charged before Police Justice Burnham of Milton, at Ballston Spa, by Superintendent Selden, with the crime of being a disorderly person, and also with the crime of cruelty to animals, and also with the crime of cruelty to children, and by which false, scandalous and defamatory words the defendant meant and was understood to mean that plaintiff not only failed and neglected to provide for his children according to his means and ability, but that he also devoured the food that had been furnished his said children by the neighbors of the plaintiff, and thereby accusing the plaintiff of " the crime of being a disorderly person, and also of the crime of cruelty to children."

The complaint concluded with the allegation that by reason of

the publication of such words he was brought into disgrace and disrepute among his neighbors, and claimed damages.

The answer admits the publication of the alleged libelous words set out in the complaint, but avers that such publication was without intending to prejudice or injure the plaintiff in his alleged character and reputation, and without malice towards the plaintiff.

It is quite clear that this complaint did not charge the publication by the defendant of words which, if uttered orally, and not printed or published, would have been actionable *per se*, and if, as insisted by the learned counsel for the respondent, there is no difference as to the actionable character of words, whether spoken or written, then the complaint was properly dismissed.

At common law there was a marked and well-understood distinction between oral slander and libel.

In the former, the words to be actionable *per se*, must charge the commission of a crime involving moral turpitude and subjecting the party to ignominious punishment.

In the latter, words were actionable if they expose the person of whom they are published to hatred, ridicule and contempt, without imputing to him any crime.

In *Cropp* v. *Tilney* (3 Salk. 226), Lord Holt, Ch. J., said that "scandalous matter is not necessary to make a libel, it is enough if the defendant induces an ill opinion to be had of the plaintiff or to make him contemptible and ridiculous." In *Villers* v. *Monsley* (2 Wils. 403), it was held, "if any man deliberately or maliciously publishes anything in writing concerning another which renders him ridiculous or tends to hinder mankind from associating or having intercourse with him, an action will lie against such publisher." This doctrine is laid down by Starkie on Slander, as illustrating the elementary rule (Folkard's Starkie on Slander, Wood's Notes, 230), and the learned author adds: "And, therefore, to publish, in writing of another, that he is a rogue, rascal, swindler or villain is actionable, although the terms would not be actionable had they been merely spoken."

In *Thorley* v. *Lord Kerry* (4 Taunt. 355), the libel charged the plaintiff with being a hypocrite and having used the cloak of religion, for unworthy purposes, and the plaintiff recovered a verdict for the libel. In the King's Bench, on appeal to the Exchequer Chamber, Sir J. Mansfield, Ch. J., in affirming the judgment, said: "Though

the words impute no punishable crimes they contain that sort of imputation which is calculated to vilify a man, and bring him as the books say into hatred, contempt and ridicule; for all words of that description an indictment lies." In *Archbishop Tuam* v. *Robeson* (5 Bing. 17), BEST, Ch. J., says: "According to that case (*Lord Kerry* v. *Thorley, supra*), in order to support an action for oral slander, something criminal must have been imputed; but in libel, any tendency to bring a party into contempt, or ridicule, is actionable, and in general any charge of immoral conduct, although in matters not punishable at law."

The same rule has been adopted in this country. In *Thomas* v. *Croswell* (7 Johns. 264), it was held to be libelous to publish of a member of Congress, "he is a fawning sycophant, a misrepresentative in Congress, and a grovelling office seeker; he has abandoned his post in Congress in pursuit of an office." While these words did not charge or impute to the plaintiff the commission of a crime, it was held that they were properly submitted to the jury, who were left to pass upon the question as to whether the words published tended to bring the plaintiff into contempt and ridicule, and the jury having found for the plaintiff, their verdict was sustained on appeal.

In *Cramer* v. *Riggs* (17 Wend. 210), NELSON, Ch. J., in discussing the character of words claimed to be libelous, uses this language: "There can be no doubt the allegations in the libel, if published in the shape of mere oral slander, would not *per se* have been actionable; they impute no indictable offense, but if they tend to expose the character of the plaintiff to ridicule and contempt of the community, whether they impute a punishable offense or not, they are actionable when put forth in the shape of written or printed slander."

In *More* v. *Bennett* (48 N. Y. 472), the libel was contained in a letter published in the New York *Herald*, which, after describing a woman as a prostitute, adds, "She is, I understand, under the patronage or protection of a Mr. More, agent of the Central railroad, who has also employed the orderly of my late husband."

The plaintiff in this case was nonsuited at the trial on the ground that the complaint did not allege that the publication intended to charge that the prostitute was under his protection for illicit purposes. The nonsuit was set aside by the Court of Appeals, HUNT, J., holding that the publication was libelous, and in his opinion says:

" Words which are of themselves actionable, which in their natural construction tend to injure the memory of the dead, or the reputation of one alive, and expose him to hatred, contempt or ridicule, need no averment that they were intended to impute such offense."

It need not be said here that the words above quoted did not impute a crime for which More could be punished criminally, and that they would not, therefore, be actionable *per se*, if uttered orally. They became actionable by reason of the deliberate act of the defendant in printing or publishing the same.

In *Cooper* v. *Greeley* (1 Den. 362), the court, by JEWETT, J., says : " The proposition of the defendant's counsel, that to render a publication actionable, it must impute a crime, *cannot be sustained*. This rule has never been extended to libels in this State, nor has it been in England for the last one hundred and fifty years." The learned judge in this opinion, at page 363, quoted with approbation the language of the author in Starkie on Slander, by Wendell, volume 1, page 169, as follows : " Upon the whole it may be collected that any writing, pictures or signs, which derogate from the character of an individual, by imputing to him either bad actions or vicious principles, or which diminish his respectability and abridge his comforts, by exposing him to disgrace and ridicule, are actionable *without proof of special damage ;* in short, that an action lies for any false, malicious and personal imputation, effected by such means and tending to alter the party's situation in society for the worse."

We are referred by the learned counsel for the defendant to *Purdy* v. *The Rochester Printing Co.* (96 N. Y. 372).

In that case the plaintiff, who was a coroner, was called to hold an inquest over the remains of a man found in the snow and apparently frozen to death. The coroner took charge of the case and impaneled a jury, and on further examination the person was found to be alive. The defendant's publishing company published the account of the coroner's proceedings ; for that publication the plaintiff, without alleging that he was a physician, prosecuted the defendant for libel.

On the trial no malice being proved, and the words relating to the official character of the plaintiff and exhibiting a prompt and efficient performance of his duty, the court directed a verdict for the defendant.

I do not think that the case is analagous to the one at bar.

We have carefully examined all the authorities referred to by the learned counsel for the respondent, and find none that goes to the length of holding that words not imputing a crime may be published reflecting upon the character and social standing of a person, and calculated to bring him into disrepute, and leave him remediless.

It is quite true, as urged by the learned counsel for the defendant, that when we go beyond well-defined limits, marked by criminal charges, as fixed in oral slander, of words actionable *per se*, we have not the sure guide in determining the limit of what are libelous publications. But such doubt must be solved by the application of the tests, which we have seen consist of whether the libelous words charged tend to diminish the respectability of the plaintiff and expose him to disgrace, ridicule and obloquy.

If they do, they are within the authorities libelous and actionable, without alleging or proving special damages.

Tested by these rules we must hold that the learned judge erred in dismissing the plaintiff's complaint.

The judgment must be reversed and a new trial ordered, costs to abide the event.

PUTNAM, J. :

I concur. See *Shelby* v. *The Sun Printing & Publishing Association* (38 Hun, 474; affd., 109 N. Y. 611); *Morey* v. *The Morning Journal Association* (123 id. 207).

HERRICK, J., not acting.

Judgment reversed, new trial ordered, costs to abide event.