Cooper *v.* Greeley.

## COOPER *vs.* GREELEY & McELRATH.

The definition of a libel, sanctioned by the court in *Steele* v. *Southwick*, (9 *John. R.* 214,) approved. *Per* JEWETT, J.

A publication stating that the plaintiff is about to commence a suit for a libel, but that he will not like to bring it to trial in a particular county, *because he is known there*, is libellous.

Such a publication amounts to a charge that the plaintiff is in bad repute in the county referred to, and for that reason would not like to bring the issue to trial in that county.

In an action for such publication it is a good plea that the plaintiff resides in and is known in the county named, and there sustains the reputation of "a proud, captious, censorious, arbitrary, dogmatical, malicious, illiberal and litigious man," in consequence of which he would not like to bring a libel suit to trial in that county.

In such an action a plea averring generally that the plaintiff, residing in and being known in the county in question, had acquired a bad reputation there, in consequence of which he would not bring the suit to trial in that county, is good.

Where the plaintiff is charged with the reputation of having committed a particular offence, or with having neglected some particular duty, the defendant cannot rely upon the reputation charged, but must aver and prove the plaintiff actually guilty. Such a case is distinguishable from one where *general* bad reputation is charged. There the plea may allege the existence of such reputation merely. *Per* JEWETT, J.

A plea answering only part of a count, is bad, though other parts are answered by other pleas, and the general issue is pleaded to the whole declaration.

DEMURRER to pleas, in an action for libel. The declaration, after the usual introductory matter, alleged, in the first count, the publication by the defendants in the New-York Tribune, of a certain false and malicious libel of and concerning the plaintiff, containing (*inter al.*) the following matter, which is set out with *inuendoes*, applying it to the plaintiff. "At all events, having published the letter excepted to as a matter of intelligence, without any sort of feeling towards Mr. Cooper, but such as his conduct in the case seemed to excite, we have at all times stood ready to publish cheerfully any correction or contradiction he might choose to send us. He chooses to send none, but a suit for libel instead. So be it then—walk in Mr. Sheriff! There is one comfort to sustain us under this terrible dispensation. Mr. Cooper will have to bring his action to trial some-where. He will not like to bring it in New-York, for we are known here, nor in Otsego for he is known there." An *inuendo* follows, averring the meaning to be that the plaintiff, in consequence of being known in the county of Otsego, was in bad repute there, and would not for that reason, like to bring a suit for libel in that county. The second count avers the publication, by the defendants in the New-York Daily Tribune, of another alleged libel, one part of which contained, as alleged, the following libellous matters, with *inuendoes*, shewing its application to the plaintiff. "Knowing what we positively did and do of the severe illness of the wife of Mr. Weed, and the dangerous state of his eldest daughter, at the time of the Fonda trials in question—regarding them as we do—the jokes attempted to be cut by Fenimore over their condition—his talk of the story growing up from one girl to the mother and three or four daughters— his fun about their probably having the Asiatic cholera among them, or some other contagious disease, &c. &c.—however it may have sounded to others, did seem to us rather inhu— (meaning inhuman.) Hallo there! We had like to put our foot right into it again, after all our tuition. We mean to say that, considering that just the day before Mr. Weed had been choked by his counsel into surrendering at discretion to Fenimore, being assured (correctly) by said counsel that, as the law is now ex-

pounded and administered by the supreme court, he had no earthly choice but to bow his neck to the yoke, pay all that might be claimed of him, and publish whatever humiliation should be required, or else prepare to be immediately ruined by the suits which Fenimore and Richard had already commenced, or were getting ready for him;—considering all this, and how much Mr. Weed had paid and must pay to- .wards his subsistence—how keenly W. has had to smart for speaking his mind of. him—we did not think that Fenimore's talk at this time and place of Weed's family, and of Weed himself as a man so paltry that he would pretend to sickness in his family as an excuse to keep away from court, and resort to trick after trick to put off his case for a day or two—it seemed to us, considering the present relations of the parties, most ungen—(meaning either ungenerous or ungentlemanly.) There we go again!" In connexion with this extract it was averred that the syllables "*inhu—*" were intended for *inhuman*, and were designed to and did convey that meaning, and that the syllables "*ungen—*" meant either *ungenerous*, or *ungentlemanly.* Another part of the libel complained of in this count, was alleged to contain the same libellous matter set out in the first count, which was repeated with similar *inuendoes ;* and still another part sets forth the following matter alleged to be a part of the same libel. "Fenimore (meaning the said plaintiff) closed very effectively with an appeal for his character, and a picture of the sufferings of his wife and family—his grown up daughters often suffused in tears by these attacks on their father. Some said this was mawkish, but we consider it good, and think it told. We have a different theory as to what the girls were crying for, but we won't state it, lest another dose of supreme court law be administered to us." *Inuendo*, "that the said plaintiff, by some unworthy and disreputable conduct, was the cause of affliction and tears in his family."

The defendants, besides the general issue, pleaded several special pleas. The first plea to the first count alleged that the defendants were the editors and publishers of the newspaper mentioned in that count, and as such published of and concern-

ing the plaintiff the words set forth in the count, which, they aver, were parcel only of an article published by them, the whole of which is set forth, as follows: "Mr. J. Fenimore Cooper informs the public through the Albany Argus, that he has directed legal proceedings to be commenced 'against the editors, publishers, &c. of the Tribune and Evening Journal.' So we are to 'catch it' for publishing a letter from Fonda, detailing the proceedings at the late circuit court held there, in the cases of J. Fenimore Cooper *vs.* Thurlow Weed, and The People of New-York *vs.* James Watson Webb. Precisely what we have done to incur the pains and penalties of the law we do not understand, but we doubtless shall when the sheriff clutches and Mr. J. Fenimore Cooper rains down upon us. Mr. Cooper tells the story at greater length, and puts in some excuses for his conduct in driving his own suit to a verdict by default on the second day of the term, in the face of a statement from Mr. Weed that he was compelled to get out of the cars to attend the bedside of a dying daughter, and would be up the next day: but we do not perceive that he contradicts our correspondent on any essential point. [Here the libellous matter set out in the first count is inserted.] We believe he has no resource left but to bring it in Montgomery county, among those who were the witnesses of, and 'sympathisers' in his late defeat by Col. Webb. That is rather inconvenient to us, but we feel confident of a fair trial and a good deliverance before any American jury. So, Mr. Effingham, fetch on your bears!" The plea proceeds to aver that the alleged libellous matter was published by the defendants as a reply to, and a comment upon a notice which the plaintiff had just before caused to be published in the Albany Argus, which notice is set out as follows: "The New-York Tribune and Albany Evening Journal having both published false statements concerning the proceedings connected with the inquest taken in my suit against Thurlow Weed at the late Montgomery circuit, I ask room for the following statement of facts. The cause was first noticed for trial in May last. Mr. Weed then appeared without counsel and asked for delay on the plea that he had forgotten that the cause had been noticed. The

judge granted a delay of six months on this plea, saying at the time that the application was exceedingly feeble. At the late circuit we appeared the first day, and Mr. Weed did not. The Evening Journal says: 'Cooper's cause against us stood nearly at the foot of the calendar, and would not have been reached in the ordinary course of business until the last day of the week.' It was number thirteen, in a calendar of forty, and was reached the first day. The allegation of the Tribune that Cooper moved for judgment by default, is utterly untrue. When the case was called we merely said we were ready: and when the statement was made that Mr. Weed was detained by the indisposition of a child, the court distinctly refused to grant a delay on such a plea presented in such a manner. My counsel were opposed to the delay, believing the whole to be a trick. An appeal was then made personally to myself, and I consented to a delay until the cars should arrive on the following day, in direct opposition to the advice of my counsel openly expressed in court, and at a moment when the judge said that this delay entirely rested with myself. It was clearly expressed by me at the time of granting this delay, and as clearly assented to by Mr. Sacia, on behalf of Mr. Weed, that I was to take my inquest the next day, unless some one should appear to defend the suit. Mr. Sacia had openly stated on the authority of Mr. Weed and as coming from Mr. Weed, that Mr. Hill, a lawyer of merit, was to appear for the defendant; but at the time when this statement was made, a person of respectability informed me that he was confident that Mr. Hill had no such intention. The cause lay over for twenty-four hours. The next day two trains arrived from Albany, with intervals of two or three hours, before the cause was moved by us. Neither Mr. Weed nor Mr. Hill had arrived. I may say here that the latter did not attend the circuit at all. Mr. Sacia asked for further delay. The court answered, it would grant no delay without the consent of parties. I then stated I left the matter with the court, and that I had no faith in the excuses. The result was an inquest and a verdict of $400. It remains only to say that Mr. Weed had pleaded the general issue without notice. Of course he could

not justify. We held his full admission of publication, &c. and of course he was totally without defence. These facts were stated by the judge to the jury as reason why the defendant's rights could not materially suffer by taking the inquest. The attorneys on record for Mr. Weed are Messrs. Parmelee and Loveridge, of the city of Albany. Neither of these gentlemen has ever appeared, in this case at Fonda; nor was any affidavit, but one founded on hearsay, offered. I have directed legal proceedings against the editors, publishers, &c. of the Tribune and Evening Journal. Yours, respectfully, J. FENIMORE COOPER." The plea then avers that the plaintiff at the time of the publication, and long before, resided in the county of Otsego, and was known to many citizens of that county; and being so known had acquired and then had "the reputation of a proud, captious, censorious, arbitrary, dogmatical, malicious, illiberal, revengeful and litigious man, wherefore the said plaintiff was in bad repute in the said county of Otsego," in consequence of which he did not like to and would not bring an action against the defendants, for words, to trial in the said county of Otsego; wherefore the defendants, being such editors and publishers as aforesaid, published the said words, &c. The second plea to the first count is to the same effect, except that instead of the averment that the plaintiff had acquired in Otsego county a reputation for certain qualities as stated in the first special plea, it is averred generally that he had acquired "a bad repute among citizens of this state residing in said county." There are three special pleas to the second count, each of which pleas contains matter which professes to be an answer to a distinct portion only of the words set out in that count.

The plaintiff demurred to each of the special pleas, and the defendants joined in demurrer. Among the causes of demurrer specified, it was objected that the pleas to the first count should have averred facts or conduct on the part of the plaintiff, on account of which he might justly be held in bad repute, and that each of the pleas to the second count was bad for not embracing the whole count.

Cooper *v.* Greeley.

*R. Cooper,* for the plaintiff. The charge in the first count, that the plaintiff was in bad repute in Otsego county in consequence of being known there, is, in effect, a charge that he merits a bad reputation. It is like saying that he has been guilty of conduct which would cause a bad reputation to attach to him. Such a charge can only be answered by the allegation and proof of facts establishing such alleged misconduct. The pleas to the first count set forth no act nor any conduct on the part of the plaintiff—but only that among certain citizens of Otsego county he had acquired a bad reputation. A plea as general as the libel is bad. It should always state facts establishing the truth of the imputation. (*Fidler* v. *Delavan,* 20 *Wend.* 57; *Skinner* ads. *Powers,* 1 *id.* 451; *Van Ness* v. *Hamilton,* 19 *John. R.* 349; *Brook* v. *Bemis,* 8 *id.* 455; *J'Anson* v. *Stuart,* 1 *T. R.* 748; *Chitty's Pl. 8th ed.* 494, 536; 11 *Price,* 235; 1 *Taunt.* 543; *Matson* v. *Buck,* 5 *Cowen,* 499; *Duncan* v. *Thwaites,* 3 *Barn. & Cress.* 556; *Vessey* v. *Pike,* 3 *Carr. & Payne,* 512.)

Neither of the pleas to the second count answer, or profess to answer, the libellous matter charged in that count. The count sets forth the publication of three distinct libellous charges against the plaintiff. First. Of inhumanity. Second. Of acting most ungenerously. Third. Of bringing law suits against Mr. Weed to furnish himself with the means of subsistence. Neither of the pleas attempts to answer more than one of these charges. It is well settled that each plea must answer the whole count to which it is pleaded; and that the consideration that the general issue is pleaded to the whole declaration, does not help the defective plea. (*Underwood* v. *Campbell,* 13 *Wend.* 78; *Shook* v. *Fulton,* 4 *Cowen,* 424; *Slocum* v. *Despard,* 8 *Wend.* 615; *Etheridge* v. *Osborn,* 12 *id.* 399; *Phelps* v. *Sowles,* 19 *id.* 547.)

*A. B. Conger & W. H. Seward,* for the defendants. 1. The first count in the declaration is bad. The words set forth do not constitute a libel. The charge that the plaintiff did not for any cause like to bring an action for libel to trial in Otsego

county is not defamatory or libellous. It only reiterates and applies to the plaintiff a truism, that a prophet has no honor in his own country. The point of the article is the intimation that the plaintiff would prefer a trial where the prejudices and rivalries which assail every man at home could not reach him. If this harmless language is considered libellous, it can only be upon the ground of its falling within some modern definitions which have extended the action of libel far beyond its ancient just and narrow limits, In the case of *The People* v. *Cros-well*, (3 *John. Cas.* 354,) General Hamilton, of counsel for the plaintiffs, said, quoting Lord Camden—"I have been unable to find a satisfactory definition of a libel, and I want to submit one. A libel is a censorious or ridiculing writing, picture or sign, made with a mischievous or malicious intent toward government, magistrates, or individuals." This court, in *Steele* v. *Southwick*, (9 *John. R.* 215,) approved and adopted this definition, and said it was drawn with the utmost precision. This definition enlarges the scope of actions beyond what was the settled common law of England, and what is now the law in this country. But even adopting this definition, it would not embrace the present case. This is not a censorious or a ridiculing writing. It reflects upon the plaintiff certainly, but not severely, or censoriously : and it does not convey any sentiment of ridicule. The *inuendo* extends the meaning beyond what it would fairly admit. The *inuendo* is that the defendants meant that the plaintiff was in bad repute in Otsego county. But an *inuendo* cannot extend the sense of words unless by reference to some other matters which are also spread on the record by a *colloquium*. (1 *Stark. on Sland.* 375.) The words may perhaps import that the plaintiff is not popular in Otsego county; but this is not libellous. I submit however that General Hamilton's definition of a libel is not a part of the law of this state; and that it conflicts with the long and well established law of libel. Starkie says " every man has a legal right to be protected against false and wilful communications, whether oral or written, made to his prejudice or damage. But the law which recognizes this right, also limits its extent. This is

dore by defining what communications shall be regarded as substantially injurious, and therefore actionable, though no special damage or loss can be shown—and by leaving all other cases to the operation of the general principles of law. And because the libel tends immediately to the injury of the party, presumption stands in the place of proof." (1 *Stark. on Sland.* 14.) To render words actionable *per se* they must be not only defamatory, but calculated to villify a man and to bring him into hatred, contempt and ridicule. (*Thorley* v. *Lord Kerry,* 4 *Taunt.* 355.) Bacon's definition of libel is to the same effect. (*Bac. Abr. tit. Libel. See also* 1 *Bulst.* 40 ; 1 *Stark. on Sland.* 2, 14, 25.) Although this court, in *Steele* v. *Southwick* before cited, approved of General Hamilton's definition of a libel, yet the publication in that case was so gross and severe as to fall within the older descriptions of that offence. The same remark is applicable to the publication complained of in *Riggs* v. *Denniston,* (3 *John. Cas.* 205,) and it is surprising that Chancellor Kent (then Mr. Justice Kent) after pronouncing the words in that publication libellous, expressed a doubt whether the law would allow it to be justified, as if the truth was not always a justification in civil actions. Such and so long has been the judicial severity of this state in regard to the law of libel. In adopting General Hamilton's definition, this court, in *Steele* v. *Southwick,* referred to the case of *Villers* v. *Monsley,* (2 *Wils.* 403.) The publication in that case imputed that the plaintiff had a contagious disease ; which, if true, would tend to exclude him from all society. This case was determined in the year 1769 ; and it is submitted that at that period something more than a merely censorious or ridiculing imputation was necessary to constitute a libel. I insist that in the early stages of the law there was no distinction between verbal and written slander, and that no written words were actionable which would not have been actionable if spoken. This was expressly stated by Sir J. Mansfield in delivering the opinion of the court in *Thorley* v. *Lord Kerry* before cited : and the learned judge also stated that there was no difference in *reason* or *principle* between oral and written slander—and that the rights of the citi-

zen would be sufficiently guarded by applying to libels the rules established in cases of verbal slander. The difference, he said, between written and verbal slander was first established in the time of Charles the second : and that, if it were a new question, this difference ought not to be made. Yet he admitted that it must now be maintained because it was enforced by authorities too inveterate to be cast off. It is insisted that what was the common law at first ought to be and is the common law now, and must so remain until changed by the legislature. But if this cannot be maintained, this court at least should not carry any further the unreasonable distinction between verbal slander and libel. The supreme court of South Carolina, in *The State* v. *Furley*, (4 *McCord*, 317,) held a publication reflecting more severely upon the plaintiff than the one in question not to be libellous. The opinion of Sir James Mansfield, before cited, has been reviewed and approved of in Massachusetts in the case of *Clark* v. *Binney*, (2 *Pick*. 116 :) and in the case of *Robinson* v. *Jermyn*, (1 *Price*, 11,) in the court of exchequer in England, Graham, Baron, declared that he agreed with Sir James Mansfield, and could not consent to extend to libels severity which was not applied to verbal slander. (*See also Forbes* v. *King*, 1 *Dowl*. 672.) The discrimination between verbal and written slander deserves less countenance when we find that it was commenced in the court of star chamber during the arbitrary reign of Elizabeth, and was perfectly established during that of the second Stuart, her immediate successor. In the case before the court, the publication complained of charges no act criminal or immoral, or which tends to degrade the plaintiff, or to exclude him from society. It is not alleged that the plaintiff lives in Otsego county, or that he has any friends or connections residing there. How then can it be held to impair his fame to be esteemed disreputable in that county?

2. The several pleas to the first count are good. The pleas affirm that the plaintiff is unfavorably known in Otsego county as to all the points by which the esteem of his fellow citizens could be conciliated. They completely justify the imputation set forth in the *inuendo*. The charge is not of any acts com-

Cooper v. Greeley.

mitted by the plaintiff, but of a certain reputation. This is to be proved, not by showing specific acts or conduct, but by showing what his reputation really was. In such a case no proof of specific acts, offences or errors can be averred or would be allowed to be proved. (*Riggs* v. *Denniston, before cited ;* 11 *Price,* 225.)

3. The second count is also bad. It sets forth three distinct alleged libels. The *inhumanity* referred to was at most only a want of magnanimity in not foregoing a right which the plaintiff legally possessed. *Generosity* is not a duty or moral obligation ; and no action will lie for accusing a man of being deficient in a virtue which the law does not require a good citizen to possess. Then as to the term *ungentlemanly.* The law does not expect or require men to be gentlemen ; and the declaration does not contain any averment that the plaintiff is a gentleman. The alleged libellous matter secondly set forth in this count, is but a repetition of the words contained in the first. The third alleged libel contained in this count is but a harmless *jeu d'esprit.* The count assumes that the defendants meant to impute to the plaintiff some unworthy action or misconduct; but the words will bear equally well an entirely different explanation.

4. The several pleas to the second count are well pleaded, and furnish a perfect justification to the alleged libellous matter set forth in that count. It is conceded that this court has decided in many cases that each plea must answer the whole matter contained in the count to which it relates. But it is submitted that as the law always was and yet remains in England, a defendant in an action for libel may plead the general issue to the whole declaration, and then in separate pleas answer any particular part of any particular count. (1 *Wendell's Starkie,* 634 ; *Tidd's Pr.* 603 ; *Clarkson* v. *Lawson,* 6 *Bing.* 587 ; 2 *Dowl.* 641.) In *Root* v. *Woodruff* (6 *Hill,* 421) it is admitted by the present chief justice, in giving the opinion of the court, that the rule at present held in this country is a departure from that prevailing in England. The court is now asked to retrace its steps. The former rule could only be abolished by legislative authori-

ty. Besides, the new rule is inconvenient and impracticable, and calculated to prejudice parties in making their just defence.

*By the Court,* JEWETT, J. The first question presented is whether the first count of the declaration is good in substance. If not, it follows that the pleas interposed to that count need not be examined for the purpose of giving judgment on the demurrer; the rule being that where the count is so defective that a verdict will not cure it, the defendant on demurrer to his plea may fall back upon the count. (*Miller* v. *Maxwell,* 16 *Wend.* 9.) The defendants contend that the publication set forth in this count is not libellous. For the plaintiff it is insisted that it contains a charge that he was in bad repute in the county of Otsego, in consequence of being known in that county; and that on that account he would not like to bring a libel suit to trial there. The inquiry is, how is this publication to be understood? It is the duty of the court, in an action for a libel, to understand the publication in the same manner as others would naturally do. "The construction which it behoves a court of justice to put on a publication which is alleged to be libellous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer." (*Spencer* v. *Southwick,* 11 *John. R.* 592, *per Van Buren, Senator ; see also Fidler* v. *Delavan,* 20 *Wend.* 57.) It seems to me that the *inuendo* affixes the true meaning to the words. It may be admitted that the charge is not made in an open and direct manner. It seems to be ironical. But an imputation conveyed in that form is not the less actionable. The sting of the words in this case is in the imputation which it is alleged they convey, that the plaintiff had acquired so odious a reputation in Otsego county that, knowing enough of the influence of human action justly to apprehend danger to himself for that cause upon such a trial there, he would not dare to risk a trial in that county. Assuming this to be the true meaning of the publication, the inquiry follows—whether such language with such meaning and application is libellous within the rules of law applicable o the action for libel. The counsel for the defendants, although

they did not admit on the argument that even such language could be considered libellous within their understanding of what they denominated the modern definition of libel, yet undertook to show by argument and authority that at the period when the late Chancellor Kent, and Chief Justice Spencer, and their associates, held seats in this court, the rule in regard to what published words amounted to a libel was, more than forty years ago, greatly and unjustly extended. The definition of a libel submitted *arguendo* by the late General Hamilton, and adopted by the court in *The People* v. *Croswell* (3 *John. Cas.* 354) and subsequently approved of by the court in *Steele* v. *Southwick*, (9 *John R.* 215,) is complained of as erroneous. The court in the case last cited said that "a writing published maliciously with a view to expose a person to contempt and ridicule is undoubtedly actionable; and what was said to this effect by the judges of the C. B. in *Villers* v. *Monsley* (2 *Wils.* 403) is founded in law, justice and sound policy. The opinion of the court in the case of *Riggs* v. *Denniston* (3 *John. Cas.* 205) was to the same effect; and the definition of a libel as given by Mr. Hamilton in the case of *The People* v. *Croswell* (3 *John. Cas.* 354) is drawn with the utmost precision. It is a censorious or ridiculing writing, picture, or sign, made with a mischievous and malicious intent towards government, magistrates, or individuals. To allow the press to be the vehicle of malicious ridicule of private character, would soon deprave the moral taste of the community, and render the state of society miserable and barbarous." In the case of *Cropp* v. *Tilney*, (3 *Salk.* 226,) Holt Ch. J. said, "scandalous matter is not necessary to make a libel. It is enough if the defendant induces an ill opinion to be held of the plaintiff, or to make him contemptible, or ridiculous." Any written slander, though merely tending to render the party subject to disgrace, ridicule, or contempt, is actionable, though it do not impute any definite crime punishable in the temporal courts. (3 *Bl. Comm., Chitty's ed.* 123, *note* 5.)

But it is argued that the publication in question is not libellous, even admitting the definition of libel adopted by this court

in *The People* v. *Croswell* and in *Steele* v. *Southwick*. It is denied that it is a censorious or a ridiculing writing: and although it is conceded that it reflects upon the plaintiff, it is said that it does not do so in a *severe* or censorious manner; and that it does not convey any sentiment of ridicule. The admission that the publication reflects upon the plaintiff, though qualified by the remark that it does not do so severely, yields the material point in controversy. The degree of censure or ridicule does not enter into the definition. "A censorious or ridiculing writing towards an individual" is defined to be a libel, "if made with a mischievous and malicious intent." "Censoriousness" is defined by Webster to be a "disposition to blame and condemn—the habit of censuring or reproaching." He defines the word "reflect," in his fifth subdivision, thus: "to bring reproach; to reflect on; to cast censure or reproach." It would seem to me that if a censorious writing made with a mischievous and malicious intent towards an individual is libellous, a writing made with a like intent reflecting upon an individual, whether more or less severely, would be none the less libellous. But I do not think that the rule requires any such aid. It is enough that we approve of the rule as settled, acted upon and undeviatingly adhered to by this court for about forty years. The objection that the *inuendo* is not justified by the language of the publication is one which can only be reached by special demurrer. The office of an *inuendo* is to apply the libel to the precedent matter; and it cannot be used to add to, enlarge, extend or change the sense of the previous words; and where the new matter stated in the *inuendo* is not necessary to support the action, it may be rejected as surplusage. (1 *Chit. Pl., Day's ed.* 382; 2 *Dane's Ab.* 596; *Thomas* v. *Croswell,* 7 *John. R.* 270; *Roberts* v. *Camden,* 9 *East,* 93.) An *inuendo* may explain the meaning of words, though it cannot enlarge it without the aid of a *colloquium ;* and a leading case on this point is where, in an action for slander, the words were, "He has burnt my barn," and it was held that the plaintiff could not say by way of *inuendo,* "my barn full of corn." But if the introduction to the count in that case had contained an averment that the de-

fendant had a barn full of corn, and that in a discourse about it he spoke the words—then an *inuendo* stating the meaning of the words to be "a barn full of corn" would have been good. In such a case the *inuendo* would explain and apply the preceding parts of the declaration, by showing that the defendant's words were uttered in a conversation about a barn of the defendant's which was full of corn. In *Van Vechten* v. *Hopkins*, (5 *John. R.* 220,) Van Ness, J. explains the meaning of an *averment*, of a *colloquium* and of an *inuendo*. An *averment* is to ascertain to the court that which is doubtfully expressed, and to add matter to make doubtful things clear. A *colloquium* shows that the words were spoken in relation to the matter of the averment, and an *inuendo* is explanatory of the subject matter sufficiently expressed before. The *colloquium* in this count was for the purpose of showing that the libel was published, as it is expressly alleged to have been, "of and concerning the plaintiff." An *inuendo* is an averment that such a one means such a particular person, or that such a thing means such a particular thing; and with the introductory matter it forms a connected proposition by which the cognizance of the charge will be submitted to the jury, and the cause of action appear to the court. The *inuendo* in this case, which states the meaning of the publication to be that the plaintiff, in consequence of being known in the county of Otsego, was in bad repute there, and would not for that reason like to bring a suit for a libel in that county, appears to me to express the true meaning of the publication. The question whether the alleged libel was published of and concerning the plaintiff, and whether the true meaning of the words is such as is alleged in the *inuendo* or not, is a question of fact which belongs to the jury and not to the court to determine. (*Van Vechten* v. *Hopkins*, 5 *John. R.* 221; *Goodrich* v. *Woolcot*, 3 *Cowen*, 231 ; *Peake* v. *Oldham, Cowp.* 275 ; 2 *Bl. R.* 961; *Dexter* v. *Taber*, 12 *John. R.* 239.) It is well settled that where the slanderous charge may be collected from the words themselves or from the general scope of the publication, it is not necessary to make any averment as to circumstances to the supposed existence of which the words refer. So

where the libellous meaning is apparent on the face of the decla-
ration, *inuendoes* and averments are unnecessary; but if intro-
duced and not warranted by the subject matter, they may be
rejected as surplusage. (*Croswell* v. *Weed*, 25 *Wend.* 621.)
The proposition of the defendants' counsel, that to render a pub-
lication actionable it must impute a crime, cannot be sustained.
This rule has never been extended to libels in this state, nor
has it been in England for the last one hundred and fifty years.
The first action for a libel found in our books of reports is that
of *Riggs* v. *Denniston*, before cited, which was decided in
1802.    The late Chancellor, (then Mr. Justice Kent,) in deliver-
ing the opinion of this court, observed that the charges against
the plaintiff were clearly libellous, because they threw contumely
and contempt upon him in his character as a commissioner of
bankruptcy—instead of holding them actionable as subjecting
the plaintiff to the loss of his office.    And such has been the
doctrine of this court from that time to the present.    In *Van
Ness* v. *Hamilton*, before cited, Chief Justice Spencer said : " It
may however be observed in the outset, that there exists a de-
cided distinction between words spoken, and written slander.
To maintain an action for the former cause, the words must
either have produced a temporal loss to the plaintiff, by reason
of special damage sustained from their being spoken, or they
must convey a charge of some act criminal in itself and indict-
able as such, and subjecting the party to an infamous punish-
ment, or they must impute some indictable offence involving
moral turpitude.    To maintain an action for a libel, it is not
necessary that an indictable offence should be imputed to the
plaintiff.    If a libel holds a party up to public scorn, contempt
and ridicule, it is actionable."    It is insisted by the defendants'
counsel, that in the early stages of the law of libel, there was
no distinction between written and verbal slander, and that no
action could then have been maintained for any words written for
which an action could not be maintained if they were spoken.
The case of *Thorley* v. *Lord Kerry*, (4 *Taunt.* 355,) decided
in the exchequer chamber in 1812, is, among other cases, relied
on to sustain that position.    That was an action for a libel

charging the plaintiff with being a hypocrite, and with having used the cloak of religion for unworthy purposes. The plaintiff obtained a verdict and had judgment in the king's bench without argument, which was affirmed in the exchequer chamber upon error brought by the defendant. Sir J. Mansfield, C. J. in delivering the opinion of the court, stated that the words, had they merely been spoken, would not have been actionable; and while he disapproved of the distinction which he admitted had prevailed for more than a century past between written and spoken scandal, he said that as the rule and distinction had been so firmly established by some of the greatest names known to the law, and from a time at least as far back as the time of Charles the second, he could not venture to lay down at that day that no action could be maintained for any words written for which an action could not be maintained if they were spoken. The rule is repeated in *Starkie on Slander,* 1 *vol. by Wendell, p.* 169. After a review of all the cases on the subject, this writer says: "Upon the whole it may be collected that any writings, pictures or signs, which derogate from the character of an individual, by imputing to him either bad actions or vicious principles, or which diminish his respectability and abridge his comforts by exposing him to disgrace and ridicule, are actionable without proof of special damage; in short, that an action lies for any false, malicious and personal imputation effected by such means and tending to alter the party's situation in society for the worse." The rule is the same and the like distinction prevails in Massachusetts. (*Clark* v. *Binney,* 2 *Pick.* 113.) Assuming that at an early period of the law, before the art of printing was invented or perfected, the distinction between words spoken and written slander was not recognized, the change may, I apprehend, be accounted for by the greater necessity for such a distinction in more modern times, when the tendency of the public press is so strong to licentiousness. It does not appear to me that individual character is more than adequately protected by the legal remedies, civil and criminal, which the law, as it has been established for the last century and an half, both in England and in this country, affords. If this court were com-

petent to repudiate a distinction so well settled as that between written and spoken scandal, public policy would, in my opinion, interpose to prevent it.

Assuming then that the count is good in substance, the next inquiry is whether the first special plea to that count interposes a substantial defence and is well pleaded. For the plaintiff it is insisted that the charge of bad reputation can only be justified by facts showing such reputation deserved. Such a charge, it is said, implies in its popular acceptation that the party has done something to bring him into disrepute. The plea, it is alleged, is bad for being as general as the charge, and for the omission to state any facts which, if proved, would make good the charge. The plea sets up as a justification that the plaintiff had the reputation in Otsego county of a proud, captious, censorious, arbitrary, dogmatical, malicious, illiberal, revengeful and litigious man—and that therefore he was in bad repute. No facts or conduct of the plaintiff to show that such reputation was deserved are set forth in the plea. If the charge had been that the plaintiff had the reputation of having committed a particular crime, no one I presume would insist that a plea simply setting up the existence of such a reputation would be good. In such a case it would be indispensable to set forth the necessary facts showing the plaintiff to be guilty of the crime of which it was said he had acquired the reputation. By any other rule the reputation of any man, however pure, might be successfully assailed and effectually destroyed by a combination of malicious individuals. The general rule is thus perspicuously stated at length by Spencer, Ch. J. in *Van Ness* v. *Hamilton*, before referred to. "A plea in bar of the plaintiff's action must be certain to a common intent. It must be direct and positive in the facts set forth, and must state them with all necessary certainty. It is not correct to say that in a plea justifying a libel, because the subject comprehends multiplicity of matter, there may be general pleading to avoid prolixity." And again : "The rule to which I allude is laid down in the case of *J'Anson* v. *Stuart*, (1 *T. R.* 748.) There the action was for a libel charging the plaintiff with being connected and concerned with

a gang of swindlers and common informers.   The plea stated that the plaintiff had been dishonestly concerned and connected with and was one of a gang of swindlers and common informers, and had also been guilty of defrauding divers persons with whom he had dealings and transactions.   On demurrer to this plea it was decided that it was bad on account of its generality; that it was contrary to every rule of pleading to charge the plaintiff with swindling without showing any instances of it: for wherever one person charges another with fraud, he must know the particular instances on which his charge is founded, and therefore ought to disclose them."   In this case the charge is not of any act committed by the plaintiff, or the reputation of the commission of any particular act improper, immoral, criminal or otherwise; but only that in the estimation of the public in the county named, the plaintiff's reputation is bad: in other words, that his good name, credit or honor, as derived from public opinion, was to a greater or less extent forfeited or bad; that such was the public estimation at the time of the publication in question.   This charge implies no particular act committed by the plaintiff.   The defendants justify by averring the existence of the bad reputation, specifying in this plea the particular odious qualities which the plaintiff was reputed to possess, and averring that on that account he did not like to try his cause in that county.   I think the plea is sufficient.   I do not see in what other manner a justification could be interposed.   In the nature of things, it would be impracticable for the defendants to spread upon paper the particular manifestations of pride, captiousness, malice, &c. which go to form such a character, and to prove that his public reputation was the consequence of such conduct.   Reputation is the estimate in which an individual is held by public fame in the place where he is known.   And the existence of a good or bad reputation is, I think, a fact which may be directly put in issue.

The other special plea to the first count is in substance the same with the one just examined.   It differs from that, in omitting to mention the particular traits of character specified in the first special plea: and it simply alleges the plaintiff's residence

in Otsego county, his being known to divers citizens there, and his having acquired a bad reputation among them. Though more general than the first special plea, I do not see but that it is sufficient. The plaintiff is not charged with doing any act or omitting to do any act by which he is liable to a particular charge affecting him in his character in any manner; and of course the rule requiring the plea to set forth the particular acts of the plaintiff constituting the particular thing charged, is not applicable to this defence. The libel merely represents the estimate which the public place upon the plaintiff's general character. That is a *fact* not capable generally of being charged upon, or traced, as the result of any particular or general character of the party. It is public opinion. It may exist without any just foundation; but whether justly or unjustly formed, the grounds of it are manifestly incapable of being put in issue. I do not therefore think that a party is called on to set forth and prove the grounds of such public estimate of reputation; and still less is he bound to show that such public estimation was correctly made. Where the plaintiff is charged with a reputation of having committed some particular offence, or with the neglect of some duty, the rule, as has been shown, is different: and there the defendant can only justify by establishing the truth of the reputation; that is, that the plaintiff has been guilty of the precise offence referred to in the charge. The allegation and proof of reputation will not in such a case avail the accuser.

The principles discussed and the conclusions arrived at upon the examination of the first count equally apply to the questions arising under the second count, and I am of opinion that that count is good in substance.

The remaining question therefore, is whether the several pleas to that count are well pleaded, and furnish a justification. Each of these several pleas professes to answer a distinct and separate portion of the libellous matter set forth in the count; and each plea taken by itself leaves other portions of the libellous matter unanswered. On the part of the plaintiff it is insisted that every plea in bar must answer the whole declaration, or count, to which it is pleaded, even although the charge against the de-

fendant be severable in its nature; and that within this princi-ple, each of the several pleas to this count is bad. This objec-tion to the pleas is unanswerable and must prevail. (*Root* v. *Woodruff*, 6 *Hill*, 421, *and cases there cited.*) "It is well settled here," to use the language of Mr. Justice Bronson in that case, "that every plea in bar must not only contain a good answer so far as it professes to go; but it must answer the whole declaration or count to which it is pleaded. If the whole be not answered, the plaintiff may demur, and the action will not be thereby discontinued; but the plaintiff will be entitled to judgment."

The plaintiff is entitled to judgment upon the demurrer to the several pleas to the second count, and the defendants to judgment upon the demurrer to the pleas pleaded to the first count, with leave to each party to amend on the usual terms.

Judgment accordingly.