SILAS WILLIAMS *against* EDWIN L. GODKIN *et al.*

In a newspaper article describing the means by which the stock of a worthless silver mine was by a fraudulent scheme sold for a large sum, the plaintiff was stated to have been employed to prepare the mine by plastering and engrafting silver ore on the limestone rock, while armed men guarded the entrance to the mine, and it was also stated that the defendant was an expert in preparing a mine in this way, and that his services in this regard were as valuable as those of the person through whose influence and standing the stock of the company was sold: *Held*, on demurrer, that the article, without the aid of any extraneous matter, charged the plaintiff with having knowingly aided in a swindling enterprise, and was libelous.

APPEAL from an order of this court overruling a demurrer to the complaint.

The action was for libel, and the complaint alleged that the defendants were the publishers of "The Nation," a newspaper published in New York city, and that the plaintiff had been for several years engaged in the business of overseeing or superintending silver mines, and especially of the Emma Silver Mining Company; that on December 18th, 1873, the defend-

ants published in their paper an article entitled " The True History of a Great Mining Enterprise," in which were contained the following false and defamatory words :

" Mr. Silas Williams, it seems, is admitted by Mr. Park, to be about the best man, in his acquaintance, to prepare a mine, and Mr. Williams was sent for.    In the month of September the number of men working on the mine " (meaning the Emma Silver Mine referred to in said article) " was reduced from a hundred to a dozen.    No one was allowed to go into the mine without a written order, and armed men were stationed as guards at the entrances, while Mr. Silas Williams occupied himself in plastering and engrafting silver ore on to the limestone rock.    The mine was now nearly worked out.    There were 1,500 tons of ore raised and on hand, and the value of the mine was, in Mr. Park's opinion, at that time expressed to be about $250,000.  ·  The details of the preparation being arranged, Mr. Park and Senator Stewart sailed for England. Professor Silliman, of Yale College, had been through the mine, had seen the plastered walls, and made a very interesting and instructive report, for which he is said to have been promised $5,000, and a second sum of $4,500, if the sale in England was accomplished.

" The scene changes now to England, where we find Mr. Park and Senator Stewart, armed with Professor Silliman's report, trying, at first without success, to float their scheme. * * *

" But Mr. Park was a man of genius, and it occurred to him that, if the new English company were headed by General Schenck, the American minister in London, it would probably acquire a reputation at once.    General Schenck having little or no money, it was arranged that money should be provided for him, and that he should thus enter the company as a *bona fide* investor.    This was no less important than the preparation of the mine by Mr. Silas Williams. * * *

" Mr. Park received £500,000 in cash, settled with Albert Grant (an English speculator, as expert in rigging the market as Mr. Silas Williams had shown himself in preparing, plastering, and engrafting) for £100,000, and a further prospective sum of £60,000 or £70,000 more, which he seems to have got

afterwards, while with Mr. James E. Lyon, entitled to one-eighth of the purchase, less $1,500,000, a compromise was effected by which he got $30,000 for his whole claim, Mr. Park very kindly letting him know that a peculiar arrangement had been entered into by which the whole of the London shares were locked up and inaccessible in the hands of Mr. Grant for nine months or more, and that before the expiration of that period, in all human probability, the ' game would be played out ' and the mine ' bust up.' "

That by reason of this publication, the plaintiff had been injured, &c.

The defendants demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action.

The demurrer was overruled by the court at special term, and the defendants appealed.

*James C. Carter*, for the appellant, argued that the words were not in themselves actionable ; that there was no charge that plaintiff had plastered or engrafted ore on the limestone rock with the view of deceiving purchasers, or with knowledge that those by whose direction it was done intended thereby to deceive purchasers, and that the court could not say that there was anything objectionable in preparing, plastering or engrafting a mine ; that the complaint could only be sustained on the ground that the article published charged the plaintiff with being engaged in a *conspiracy* to defraud, and there was no charge of any such conspiracy (citing *O'Connell* v. *Mansfield*, 9 Irish Law Reports, 179).

*E. L. Fancher*, for respondent.

DALY, Chief Justice.—What was published in the article respecting the plaintiff is upon its face libelous, without any innuendo to point or give effect to it. It is to be understood by the court in the sense in which the world generally would understand it, giving to the words their ordinary meaning, and in understanding what was meant and is conveyed by

the publication respecting the plaintiff, the scope and meaning
of the whole article is to be considered (*More* v. *Bennett*, 48
N. Y. 476; *Cooper* v. *Greeley*, 1 Denio, 361; *Crosswell* v. *Weed*,
25 Wend. 621; *Harvey* v. *French*, 2 M. & Selw. 591.)

If the necessary effect of what was stated, respecting the
plaintiff, is to injure his reputation and lower him in the esteem
and opinion of the community, it is libelous (*State* v. *Insdell*,
5 Harring. [Del.] 475; *Dexter* v. *Spear*, 4 Mason, 115;
*Sanderson* v. *Caldwell*, 45 N. Y. 402; *Weed* v. *Foster*, 11
Barb. 204; 1 Hilliard on Torts, c. VII, § 13; Addison on
Torts, 767, 768.)

The article is entitled, "The True History of a Great Min-
ing Enterprise," and the history given in the article is that the
Emma Silver Mine was nearly worked out, that there were
1,500 tons of ore raised, and on hand, and that the value of
the mine, in the opinion of one Park, was $250,000. That
Park admitted that the plaintiff, was the best man of his
acquaintance, *to prepare a mine*, and that the plaintiff was
sent for. That the number of men working on the mine,
was reduced from one hundred to about a dozen, and that in
the month of September, no one was allowed to go into the
mine without a written order, and that armed men were
stationed as guards at the entrance, *whilst the plaintiff occupied
himself in plastering and engrafting silver ore on to the lime-
stone rock*. That the *details* of *the preparation* being *arranged*,
Park and Senator Stewart sailed for England. That Professor
Silliman, of Yale College, had been through the mine, seen the
plastered walls, and made an instructive and interesting report.
That armed with this report, Park and Stewart tried at first,
without success, to float their scheme. That it occurred to
Park that if the English company were headed by Gen.
Schenck, the American minister, the company would acquire
reputation at once; that he having little or no money, it was
arranged that money should be provided for him, and that he
should enter the company as a *bona fide* investor. That this
was no less important than *the preparation of the mine by the
plaintiff*. That Park received half a million of pounds sterling
in cash, and for £100,000, and a further prospective sum of

$60,000 or $70,000, which he seems to have got afterwards, that Park settled with Albert Grant, an English speculator, as expert in rigging the English market, as the plaintiff had shown himself in preparing, plastering and engrafting. The remainder of the article relates to a compromise effected by Park with one Lyon, after letting Lyon know that a peculiar arrangement had been entered into, by which the whole of the London shares were locked up, and inaccesible in the hands of Grant, for nine months or more, before the expiration of which period, in all probability, the game would be played out, &c.

It is, in substance, an account of a fraudulent scheme, by which a silver mine was sold in England for over half a million pounds sterling, more than ten times its actual value; which was accomplished by having it prepared by the plaintiff in the manner above stated; by getting, after it was so prepared, a report of a professor of a college respecting it; and by furnishing the American minister in London with money to become a *bona fide* investor, and placing him at the head of the company in England to give it reputation.

The plaintiff is represented as one of the most efficient agents in the consummation of this scheme. He is described as preparing the mine by plastering and engrafting silver ore on limestone rock, whilst armed men guarded the entrance, and as being the best man known to one of the chief actors in the scheme, to prepare a mine in this way. What he did is referred to as equal in importance, to the putting of the American minister at the head of the company, and he is further characterized as being as *expert* in preparing, plastering and engrafting, as the English speculator, with whom Park settled, was in "rigging the market."

In my judgment such a statement is injurious to the reputation of the plaintiff, and assuming it to be untrue, the necessary effect of it is defamatory.

I have looked into the case upon which the defendant's counsel relies (*O'Connell* v. *Mansfield*, 9 Irish Law Reports, 179). In that case all the judges agreed that the publication was highly defamatory, but the question was whether it went

so far as to charge the plaintiff with the crime of conspiracy ; three of the judges being of opinion that it did, and six that it did not.   The point was important, because the defendant had put in a plea of justification, averring the truth of everything but a conspiracy, and if that crime was imputed in the defamatory matter, the justification had not gone far enough.   The majority of the court held that what was published respecting the plaintiff did not amount to charging him with having been guilty of a conspiracy, that being a distinct criminal offense, and that the justification therefore was a full and complete answer to the action.

So in this case, it may be that what was printed respecting the plaintiff did not charge him with a conspiracy, which is a corrupt agreement by two or more to do by concerted action an unlawful thing, which would, if done by one alone, be indictable as a criminal offense, or which is by its nature and by reason of the combination, meant to injure the public or some particular individual (2 Bishop on Criminal Law, §§ 172, 176). Whether what was published respecting the plaintiff did, or did not impute to him the criminal offense of conspiracy, might be as doubtful and embarrassing a question as the one discussed and passed upon in the case cited; but there can be no reasonable doubt, I think, that what was said respecting the plaintiff, independent of that question, was in its nature defamatory.

The order overruling the demurrer must therefore be affirmed.

LARREMORE, J., concurred.

Order affirmed.