## PFITZINGER v. DUBS et al.

(Circuit Court of Appeals, Seventh Circuit. November 27, 1894.)

No. 186.

LIBEL—LANGUAGE ACTIONABLE PER SE.

> An article in a newspaper, consisting of a letter in which it is said, of and concerning the plaintiff: "You cannot get P. down any lower than he is; he is low enough; you can't get him down any lower; you can't spoil a rotten egg,"—is grossly libelous per se, even without innuendoes to explain the meaning of the language used, and no allegation of special damage is necessary.

Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

Action on the case by Michael Pfitzinger against Rudolph Dubs, August Haefele, and the Volksblatt Printing Company. Defendants obtained judgment on demurrer to the declaration. Plaintiff brings error.

Francis J. Woolley and Wm. Richie, for plaintiff in error.

James Lane Allen and Samuel E. Knecht, for defendants in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This is an action brought by the plaintiff in error, a minister of the gospel, and a citizen of Buffalo, N. Y., against the defendants, citizens of Chicago, Ill., for printed libel. The defendants are, respectively, editor, manager, and publisher of a German religious newspaper published at Chicago, Ill., called the Deutsche Allgemeine Zeitung. On the 22d day of September, 1893, they published in the said paper a communication of and concerning the plaintiff, purporting to be a letter from one H. Horn, of Syracuse, N. Y., in the German language, and which, translated into English, is as follows:

"From the State of New York.

"Dear Bro. Dubs: The Lord be with you. In the D. A. Z. there was recently asked, among other questions, one directed to L. Heinmiller, of Buffalo, New York. As it appears, L. Heinmiller will not answer this question. Why he will not answer it, he knows best. The question is, why does the preacher, L. Heinmiller, of Buffalo, N. Y., compare M. Pfitzinger with a rotten egg, if he has unwavering confidence in M. Pfitzinger? Who the questioner is, I do not know. Perhaps Bro. Heinmiller knows to how many other persons he has made this comparison, and since he does not answer the question I thought it my duty to answer this question myself, for there is a great deal connected with the question that I will not mention just at this time. Well, for the answer to this question: At the time when Pfitzinger was preparing to get me down, and I was preparing to meet him, I opportunely met L. Heinmiller. It was at the time when his brother, G. Heinmiller, was on

the way from Germany to the conference at Indianapolis, and passing through Syracuse, and preaching in the evening at the Salem church. After the Divine service, when we, I and Heinmiller, had greeted each other, he at once said to me. 'Bro. Horn, do you think you can get Bro. Pfitzinger down?' I answered: 'I can and will prove my case.' Then Bro. Heinmiller replied: 'Bro. Horn, you cannot get Pfitzinger down any lower than he is. He is low enough. You cannot get him down any lower.' I was amazed to hear such a remark from the man, and said, 'Heinmiller, what do you say?' He said: 'It is a fact, he is low enough; you can't get him down any lower; you can't spoil a rotten egg unless you open it and sh—— in it.' I was still more amazed, and said: 'Why, Heinmiller! how you do talk!' He said: 'That is true.' I was so amazed that I scarcely knew what to say, and wished him good night. This is what Bro. Heinmiller said to me of Pfitzinger, and, as it seems, he has made the same comparison to other persons. I hope that Bro. Heinmiller will not deny this, for a time will come when he cannot deny it. I think still more of Bro. Heinmiller. Still so much. When the conference in Indianapolis was held, and Pfitzinger got no office, I thought, so Bro. Heinmiller really knew why he spoke to me in such a manner of Pfitzinger, for what he knew his brother, G. Heinmiller, also knew; and what he knew and believed, those who were chosen as delegates to the Indianapolis conference also knew and believed. Brother Heinmiller, a word to you: Say also freely and openly that you have asserted to others that you have unwavering confidence in Pfitzinger, that you have been drawn into this current, your inner conviction is exactly the opposite, judging from your expressions. H. Horn, Syracuse, N. Y."

The declaration contains two counts,—the first charging that the article is a libel upon the plaintiff as an individual; the second, that the same words are a libel upon him in his special character as a minister of the gospel,—each count having appropriate colloquium, inducement, and innuendoes. No special damage is averred in either count, but only general damages are claimed. There were innuendoes contained in the declaration setting out this letter, showing the sense in which the most offensive portion of the charge would be understood, and the true meaning thereof to be that the plaintiff was totally unfit to be and remain a minister of the gospel, and that he had already fallen to the lowest possible degree of moral, physical, and intellectual filthiness and degradation. There were general and special demurrers put in to the declaration. Upon hearing, the general demurrer was sustained by the court; and, the plaintiff, choosing to stand by the declaration, judgment was entered against him, dismissing the action on the ground that, there being no averment of special damage, and the declaration not charging any specific character of dishonesty, crime, or immorality, the publication was not libelous, and the action could not be sustained.

The only question in the case is whether the demurrer was properly sustained,—that is to say, whether the words set out in the declaration are actionable, being published of and concerning the plaintiff in a public newspaper; and that depends upon the question whether the words are fairly capable of the construction put upon them by the plaintiff in his declaration. If they are, then the question of the meaning should have been submitted to the jury. It is only where the words are incapable of a construction injurious to the plaintiff's character that the court is justified in taking the case from the jury. Townsh. Sland. & L. (4th Ed.) p. 576; Byrnes v. Mathews, 12 N. Y. St. Rep. 74. The question of the meaning of the words

is one of fact, for the jury, unless the court can see at a glance that they are incapable of a construction injurious to the plaintiff's character, and the court should understand the words in the same manner that other persons reading the published article would naturally understand them. That is to say, they are to be taken in their usual acceptation and meaning. Under the first count, if the words, taken in their usual and ordinary sense, as they would be understood by persons reading them, tend to injure or degrade the plaintiff morally or socially, then they are actionable per se. It is not essential that the words should impute dishonesty, crime, or immorality of any specific kind or character. If they tend to degrade or dishonor him, or injure his character, or hold him up to scorn, contempt, or ridicule, or render him of less esteem in the community, morally or socially, then the words are actionable when printed. Of course, the rule is different in slander, or mere spoken words, where it is necessary that some offense known to the law should be imputed. One of the leading cases in New York upon the subject is that of Cooper v. Greeley, 1 Denio, 347. There the words which Horace Greeley had published of and concerning Fenimore Cooper, were these:

"At all events, having published the letter excepted to as a matter of intelligence, without any sort of feeling towards Mr. Cooper, but such as his conduct in the case seemed to excite, we have at all times stood ready to publish cheerfully any correction or contradiction he might choose to send us. He chooses to send none, but a suit for libel instead. So be it then. Walk in, Mr. Sheriff! There is one comfort to sustain us under this terrible dispensation. Mr. Cooper will have to bring his action to trial somewhere. He will not like to bring it to trial in New York, for we are known here; nor in Otsego, for he is known there."

The declaration was demurred to, and the contention was that the words were not libelous. Of course, the charge is very indefinite. No particular crime or immorality is alleged. But it was contended by the plaintiff that the words contained a charge that he was in bad repute in the county of Otsego, in consequence of being known in that county, and that on that account he would not like to bring a libel suit to trial there. The wo. s were held to be libelous, and their true meaning to be fixed by the innuendo, and the demurrer was overruled.

In White v. Nicholls, 3 How. 266, the United States supreme court lay down the rule thus:

"With regard to that species of defamation which is effected by writing or printing or by pictures and signs, and which is technically denominated a 'libel,' although in general the rules applicable to it are the same which apply to verbal slander, yet in other respects it is treated with a sterner rigor than the latter, because it must have been effected with coolness and deliberation, and must be more permanent and extensive in its operation than words, which are frequently the offspring of sudden gusts of passion, and soon may be buried in oblivion. Rex v. Beare, 1 Ld. Raym. 414. It follows, therefore, that action may be maintained for defamatory words, published in writing or in print, which would not have been actionable if spoken. Thus, to publish of a man, in writing, that he had the itch, and smelt of brimstone, has been held to be a libel. Per Wilmot, C. J., in Villers v. Monsley, 2 Wils. 403. In Cropp v. Tilney, 3 Salk. 225, Holt, C. J., thus lays down the law: 'That scandalous matter is not necessary to a libel, it is enough if the defendant induces an ill opinion to be had of the plaintiff, or make him contemptible and ridiculous.' And Bayley, J.. declares in McGregor v. Thwaites, 3 Barn.

& C. 33, 'that an action is maintainable for slander either written or printed, provided the tendency of it be to bring a man into hatred, contempt, or ridicule.' "

In a very recent case decided by the supreme court of Wisconsin, and reported in 58 N. W. 245 (Kay v. Jansen), the complaint alleged that the plaintiff was the mother of Duncan Kay, who was committed to the Wisconsin Industrial School for Boys, August 15, 1893, and was still an inmate thereof; that plaintiff was a tenant of defendant at that time, and up to September 1, 1893; that defendant, knowing these facts, published on two large placards on either side of his express wagon, and for many days carried the same through the principal streets of Waupun, a false and scandalous libel of and concerning the plaintiff as follows: "We know the tree by the fruit,"—meaning, according to the innuendo, that the son of the plaintiff was at the Wisconsin Industrial School for Boys, at Waukesha; he was therefore vagrant or a criminal, or incorrigible or vicious in conduct; and that she, the plaintiff, was likewise a vagrant or a criminal, or incorrigible or vicious in conduct. The court held that a general demurrer to the complaint was properly stricken out, the words placed upon the placards being, under the facts stated by way of innuendo, fairly susceptible of the opprobrious meaning ascribed to them in the innuendo. This case is in line with the former case by the same court. Buckstaff v. Viall, 84 Wis. 129, 54 N. W. 111. In that case the plaintiff whose name was Buckstaff, was a state senator residing in Oshkosh. In a newspaper article published in that city, the defendant had referred to the plaintiff as "Senator Bucksniff," and spoke of the "divine favor of Senator Bucksniff," "the legislative god of Winnebago county"; "His majesty Bucksniff"; "We are sensible, O dearly-beloved Bucksniff, of thy great wisdom and power, and humbly beseech thee," etc.; "Know, then, O divine senator, compared with whom all other senators are merely cyphers," etc. The declaration was demurred to, and the demurrer overruled, and the supreme court sustained the ruling, holding the article grossly libelous; and yet no specific charge of crime or immorality was made. The court held that the nickname itself was a term of reproach, as being in the similitude of, and suggesting, the name of "Pecksniff," one of Charles Dickens' most hated and offensive characters. It was held that the whole article, in its general scope and meaning, was calculated to injure the plaintiff in his reputation and character, both as a citizen and senator, by bringing him into shame, disgrace, hatred, scorn, ridicule, and contempt.

In Hake v. Brames, 95 Ind. 161, words quite as indefinite and uncertain in their meaning were held libelous. Defendant had written a letter in which he said of the plaintiff:

"I know this same Brames. I was unfortunate enough to have him in my employ at one time as a bookkeeper. He is a liar. I would not believe him under oath."

Each of these sets of words was held libelous, although charging no crime, and the court quotes with approval from Folkard's Starkie on Slander (section 154) as follows:

"As to those libels which by holding a person up to scorn or ridicule, and, still more, to any stronger feeling of contempt or execration, impair him in the enjoyment of general society, and injure those imperfect rights of friendly intercourse and mutual benevolence, which man has with respect to man, it is chiefly in this branch of libels, that the action for words spoken and for words written substantially differ."

So in Rice v. Simmons, 2 Har. (Del.) 417, it was said that:

"To make a publication libelous, it need not contain a direct and open charge. Though the law requires the imputation of something that will dishonor or degrade a man, or lessen his standing in society, it does not require that such imputation should be in express terms. If it did, it would extend but little protection to reputation. The character of a libel is to be judged by the effect it produces upon the mind. It does not always happen that you can at once put your finger upon the libelous matter, and the attempt to show in what it consists may depend much upon inferential reasoning, while yet the impression may be distinct upon the mind of every reader, and all the damage result to character that would arise from a plain and direct charge."

In Solverson v. Peterson, 64 Wis. 198, 25 N. W. 14, it was held that to state, in writing, of a man, that he "has turned into an enormous swine, which lives on lame horses, and that he will probably remain a swine the rest of his days," is libelous per se.

In State v. Smily, 37 Ohio St. 30, it was held by the supreme court of that state that where one falsely and maliciously publishes of and concerning another, that his house had been searched, under legal process, for the discovery of goods secretly stolen, and supposed to be secreted therein, he was guilty of libel, and that, where the language complained of as libelous will bear the meaning ascribed to it by the innuendo, whether such was the meaning intended is a question of fact, for the jury. In Massuere v. Dickens, 70 Wis. 83, 35 N. W. 349, the defendant had published the plaintiff as a "skunk," with accompanying epithets. The article was held libelous per se, though containing no more specific charges of immorality.

In Cerveny v. News Co., 139 Ill. 345, 28 N. E. 692, the supreme court of Illinois held it libelous to publish that a man failed of an election because he was an anarchist. The court say:

"An action for libel may be sustained for words published which tend to bring the plaintiff into public hatred, contempt, or ridicule, even though the same words, spoken, would not have been actionable. And it would seem so apparent that an individual may be brought into hatred, contempt, or ridicule, within the meaning of the law, by professing vicious, degrading, or absurd principles, that it can need no discussion."

In Price v. Whitely, 50 Mo. 439, the following publication was held to be libelous:

"I found an imp of the devil, in the shape of Jim Price, sitting upon the mayor's seat; and now, sir, that imp of the devil, and cowardly snail, that shrinks back into his shell at the sight of the slightest shadow, had the bravery to issue an execution against me."

Here the charge is quite as general as could well be, and yet it was held calculated to injure the plaintiff in the eyes of the community, and therefore libelous.

In Gaither v. Advertiser Co. (Ala.) 14 South. 788, a publication to the effect that plaintiff was discharged from the superintendency of an office of the Farmers' Alliance because of a loss in the business,

and that the books of such office, when balanced, showed a net profit of $5,000 on a much smaller business, and that the showing simply proved plaintiff to be a man of small business capacity, was held to be libelous per se, as reflecting on plaintiff's business capacity, though it could not be construed, by means of an innuendo, to charge dishonesty in conducting the office. In Pledger v. State, 3 S. E. 320, the supreme court of Georgia held that a newspaper article charging a real-estate agent with objecting to a negro tenant, who was thereby compelled to sell out his business at a loss, and advising colored people not to patronize the said agent, but to leave the "old skunk to himself, to stink himself to death," was libelous. In Hayner v. Cowden, 27 Ohio St. 292, it was held that words charging a minister of the gospel with drunkenness were actionable per se, without alleging special damage, when spoken of him in his official capacity. The same ruling was made in Chaddock v. Briggs, 13 Mass. 248. In Ritchie v. Sexton, 64 Law T. (N. S.) 210, defendant had written a letter containing this passage:

"Supposing, for example, I sent a question, based on hearsay evidence, to the effect that I heard from a gentleman, whom I would not think of doubting, that you were in a state of delirium tremens, or suppose I had added to that further stories I had heard, that you were utterly intoxicated in the streets."

It was held that the words were fairly capable of being reasonably understood in a libelous sense, and that, therefore, there was a question to go to the jury.

In Teacy v. M'Kenna, 4 Ir. Com. Law, 374, the plaintiff declared upon a letter published in defendant's paper, in which it was alleged that the plaintiff, being an hotel and job coach proprietor by trade, and a Presbyterian in religion, had, from mere motives of intolerance, refused the use of his hearse for the funeral of his own deceased servant because the body was about to be interred in a Roman Catholic burial ground. It was held, on demurrer, that the court could not so clearly see that the letter could not be, in any view, libelous, as to justify them in withdrawing the case from the jury.

In view of these authorities, and many others which the court has examined, we have no hesitation in holding that it was error to withhold this case from the jury. Moreover, we think the publication of the letter declared upon to be grossly libelous per se, whether published, as charged in the first count, of the plaintiff as an individual citizen, or, as in the second count, as a minister of the gospel. The whole tenor and scope of the article, from first to last, is calculated to injure and degrade the plaintiff's character, and to hold him up to ridicule and contempt, and it was hardly necessary to introduce innuendoes to show the injurious character of the charges. The words, with the entire context, are to be taken and construed in their ordinary and natural meaning, as they would be most likely to be understood by persons reading the article; and if, in so construing them, they are not grossly libelous, it is difficult to conceive what language could be so. Take these words in connection with what precedes and follows:

"After the divine service, when we, I and Heinmiller, had greeted each other, he at once said to me: 'Bro. Horn, do you think you can get Bro.

Pfitzinger down?' I answered: 'I can, and will prove my case.' Then Bro. Heinmiller replied: 'Bro. Horn, you cannot get Pfitzinger down any lower than he is. He is low enough. You cannot get him down any lower.' I was amazed to hear such a remark from the man and said: 'Heinmiller what do you say?' He said, 'It is a fact, he is low enough; you can't get him down any lower, you can't spoil a rotten egg. * * *' I was still more amazed, and said: 'Why, Heinmiller, how you talk.' He said, 'That is true.' I was so amazed that I scarcely knew what to say."

It needed no innuendo to show the meaning of such language. "Bad egg" is a well-known and commonly understood colloquium in this country for a bad or worthless person, and is so defined in the Century Dictionary (page 1853). The context also shows plainly the sense in which the words were used here. Where words have a well-understood meaning, an innuendo to show the injurious sense in which they are used is unnecessary. And the court should not be the only one that cannot understand and apply the proper meaning. The remarks of the English judges in the case of Hoare v. Silverlock, 12 Adol. & E. (N. S.) 624, seem quite as applicable to this case. The plaintiff, being the daughter of a deceased naval officer, had applied to the Royal Navy Benevolent Society for pecuniary assistance. Referring to this, defendants published of her that they were sorry to see her case had been reopened, and that the officer who reopened it had not heard her former application, and had thus missed hearing * * * the recantation of some who were her warmest friends, and who, in giving up their advocacy of her claims, had stated that they had realized the fable of the frozen snake. There was a verdict for the plaintiff. Upon a motion in arrest of judgment Lord Denman said:

"The third count (as above) is certainly good. * * * They are words well understood. There is no doubt they are commonly known in a libelous sense. It must have been left to the jury to say whether they were used in that sense or not."

Coleridge, J., said:

"As to the necessity of innuendo the jury and court, in such a case as this, are in an odd predicament, if they, alone of all persons, are not to understand the allusions complained of. Suppose the libel had said plaintiff had acted like a Judas; must the history of Judas have been given by innuendo? We ought to attribute to court and jury an acquaintance with ordinary terms and allusions, whether historical or figurative or parabolical."

And Earl, J., said:

"We cannot arrest the judgment unless we can see, on reading the whole passage complained of, that there could be no ground for the construction they have adopted. Nothing is easier than to bring persons into contempt by allusion to names well known in history, or by mention of animals to which certain ideas are attached; and I may take judicial notice that the words 'frozen snake' have an application very generally known indeed, which application is likely to bring into contempt a person against whom it is directed."

The publication of such an article as the one in the case at bar can be accounted for only upon one or other of two grounds,—either that the publishers were declaring the truth, and only the truth, of and concerning the plaintiff, for the good of others, and with a commendable zeal to impress such 'truth upon the minds of their readers by strong and apt language, or that they were trying by

the vilest means to degrade and blacken the plaintiff's character for
virtue and morality, and to bring him into disgrace and contempt
with the community as a citizen, or with his church and congrega-
tion as a minister of the gospel; and as, by the demurrer, the
falsity as well as malice of the publication is admitted, the latter
interpretation is the only one that is open to adoption by the court,
even if the declaration contained no innuendoes showing the in-
jurious character and meaning of the language. But in view of these
innuendoes, charging the meaning to be libelous, it seems quite
clear the case should not have been withheld from the consideration
of the jury. The judgment is reversed, and the case remanded to
the circuit court for further proceedings in accordance with this
opinion.