Titus, J.
The plaintiff, who is the proprietor of a private detective bureau, brings this action against the editor and proprietor of the Buffalo Express, a newspaper published in this city, for maliciously writing of and concerning the plaintiff certain things claimed to be libelous. The defendant demurs to the complaint on the ground that it does not state facts sufficient to constitute a cause of action; and as appears from the defendant’s brief submitted in the argument, the particular reasons urged are that the words are not libelous and actionable. The article complained of, which is fully set out in the complaint, criticises the board of health for employing and paying for the services of private detectives instead of the regular police-detective force of the city in the business of the health department, and doses with the following language concerning the plaintiff: 11 There may be an explanation. The only decent one we ■can ourselves imagine (and that is hardly half decent) is that the respected gentlemen of the board of health wanted something done in the line of spying and sneaking, meaner and dirtier than they had the face to ask the police department to do—and so they went to Gol. Byrne.”
This portion of the article was again published with the *76 statement that it was only an imagination of what the board of health might well have thought.
It is only necessary to determine whether the article first published is libelous, for if it is, the republication would aggravate the offense.
Numberless cases have been reported in which the plaintiff has sought to recover damages for defamation of character or injury to business, and an examination of a few will illustrate in a general way what words are libelous and what rule the courts have adopted with reference to actions of this character.
In an early case it was held that charging the plaintiff with divulging the secrets of his clients was libelous. Riggs v. Denniston, 3 John.’s Cases, 188.
In one case it was held libelous to say of the plaintiff: “The man at the sign of the Bible is no slouch at swearing to an old story.” That, although they did not charge the plaintiff with perjury in a legal sense, they held him up to contempt and ridicule; that libel is a censorious or ridiculing writing, picture or sign made with a mischievous intent towards an individual. Steele v. Southwick, 9 Johns., 214.
In King v. Root (4 Wend., 113), the plaintiff was charged with beastly intoxication. The Chancellor writing the opinion says: “There is no doubt the article complained of was libelous.”
In Cramer v. Riggs (17 Wend., 209), it was held that words which tend to expose the character of the plaintiff to the ridicule and contempt of the community whether they impute a punishable offense or not, are actionable when put forth in the shape of printed slander.
In Cooper v. Greeley (1 Denio, 347), it was held that the words published concerning the plaintiff. “He will not like to bring it (an action for libel), in New York for we are known there,” were libelous. Justice Jewett in writing the opinion of the court cites the rule laid down in Steele v. Southwich, and says it is founded in justice, law and sound policy. In Sanderson v. Caldwell (45 N. Y., 398), where the plaintiff was charged with while “in his sober moments,” of having collected soldiers’ claims “for a fearful percentage,” it was held that words which tend to degrade another in the estimation of the community or to deprive him of public confidence, are libelous, and that the rule applicable to such case is that, “when the words spoken have such relation to the occupation of the plaintiff that they directly injure him in respect to it, or to impair confidence in his character or ability, where from the nature of the business, great confidence must necessarily be reposed* *77 they are actionable, though not applied by the speaker to the profession or occupation of the plaintiff.”
In Shelby v. The Sun Printing Association (38 Hun, 474), the general term of the supreme court in the first department held that the words, “It is said that the daughters are illegitimate children of the adopted father’s intimate friend and were raised in a spirit of philanthropy,” were liberous per se. The rule is again stated and enforced, all of the justices concurring.
In Hunt v. Bennett (19 N. Y., 173) the court of appeals held that charging the plaintiff with having, while a police officer, beaten with a can a drunken woman whom he had arrested, was libelous. Again in Bergmann v. Jones (94 N. Y., 51) the rule as stated above was commented upon and approved by the learned judge who wrote the opinion of the court. Other cases from both the supreme and superior courts of Hew York bearing upon this question might be cited, but enough have been referred to to show that the courts from the earliest history of our state have followed the English common law rule that if the words published tend to injure the character of the plaintiff or to degrade him in public estimation or to bring him into disrepute or ridicule they are libelous and an action may be maintained for damages by the injured party.
The words here complained of seek to show some mystery in the employment of the plaintiff and in the payment of his bill for detective work, and leave the impression on the mind of the reader that the money paid the plaintiff was for some unworthy purpose, and that the plaintiff was taking the people’s money without an equivalent and without lawful right. If this is not the case, it is suggested that the plaintiff performed some mean, dirty work, too mean and dirty for honorable officials to do. It is claimed by the learned counsel for the defendant that the language used related to the quality of the plaintiff’s business; that the business of a private detective is at least a mean business, a spying and sneaking business; that it characterizes the employment of the private detective, and therefore is not libelous, as it gives to the plaintiff’s business its true name. I cannot concur in this view. It is not a fair construction of the language used. Such a construction should be put upon the language as would naturally be given it by intelligent men. More v. Bennett, 48 N. Y., 472.
It charges 'that the board of health wanted something done in the line of spying and sneaking, meaner and dirtier than the regular detectives would do, and so went to the plaintiff, clearly indicating that there were degrees of meanness to which detectives resort and that the plaintiff would do meaner things than the rules of detective etiquette would *78 allow. I think the article judged by the rule laid down by the court is libelous. What has been said with reference to the first article is equally applicable to the second.
The communication headed “Byrne’s Boodle” seems tome to come within the same rule. While the term boodle may not necessarily imply a criminal act its more modern application does relate to unlawfully acquired gains and imputes to "the person that he has possessed himself of' property which in good conscience and in law he ought not-to have. In that sense it was used in the article complained of.
Fair comment by the press on matters of private concern is proper, and sharp criticism of public officials is necessary often times, as its tendency is to restrain venal and corrupt-men, who often occupy public position, from committing-wrong against the people, but it has always been the policy of the law to restrain evil-minded persons from maliciously assailing the good name and character of others by holding-them criminally liable as well as punishing them by money damages at the suit of the party injured.
Having reached the conclusion that the articles are libelous, it follows that the plaintiff should have judgments overruling the demurrer with costs, with leave to the defendant, within twenty days after the service of the order, to answer
Hatch, J.
But a single ground of demurrer is stated; that the facts alleged do not constitute a cause of action. The complaint contains but one count, and avers that at the time of the publication of the alleged libel the plaintiff was, and continues to be, the proprietor of a detective police bureau in the city of Buffalo, engaged in business as-a private detective, and was as such in good name and credit.
That the defendant was, and still is, the editor, publisher and proprietor of a newspaper called the Buffalo Express, published at said city. That on the 6th day of January, 1887, the defendant maliciously composed and published, concerning the plaintiff, in said newspaper, false and defamatory matter. Then follows the article claimed to be-libelous. It further avers that thereafter, and on the 10th day of January, 1887, the defendant published two certain other articles which are thereafter set out in full. That by reason thereof plaintiff has been injured in his good name- and credit. The complaint, therefore, states a good cause of action, assuming that the articles are libelous, as it charges the publication by the defendant, and also that it-was of and concerning the plaintiff. These allegations are; sufficient. Hunt v. Bennett, 19 N. Y., 173.
*79 Upon the record the demurrer admits them. The only-question therefore is, are the articles libelous?
The first article is headed, “A Detective Insult,” and calls upon the board of health and the common council of the city of Buffalo to explain why it became necessary for the one to hire and the other to pay plaintiff for men furnished, or work performed by him, at the request of the board of health, while the city possessed a public police department. So far as it thus refers to, or interrogates those bodies, it may be dismissed as harmless to the plaintiff. The sting, if any, is found in its tail, and is couched in the following language:
“There may be an explanation. The only decent one we can ourselves imagine (and that is hardly half-decent) is that the respected gentlemen of the board of health wanted something done in the line of spying and sneaking, meaner and dirtier than they had the face to ask the police department to do—and so they went to Col. Byrne.”
Let us to this language apply the test of legal rules.
To my ear it has an ugly sound. With a proper observance of the dash, in pronouncing, it presents a stronger' meaning than the words convey. In other words, it brings to the plaintiff a personification, intensified, of all the meanness which the previous language expressed. It is understanding something not expressed in direct words, the implication of which was sanctioned by Lord-Chief-Justice De G-rey and Lord Mansmeld more than a century and a half' ago, and which remains the law to this day. King v. Horne, Cowp., 684; Cooper v. Greeley, 1 Denio, 358; More v. Bennett, 48 N. Y., 472.
Judges and text-book writers furnish plentiful definitions of what constitutes a libel, with varying shades of difference. They all agree that a malicious publication, tending to expose a person to ridicule, contempt, hatred, degradation of character, is libelous. (2 Addison on Torts, page 309; Bergmann v. Jones, 94 N. Y., 51-64.) Cases might be multiplied upon this point.
" The construction which the language should receive is well stated by Jewett J., in Cooper v. Greeley, 1 Denio, 347: “ It is the duty of the court, in an action for a libel, to understand the publication in the same manner as others would naturally do.” In Moore v. Bennett. 48 N. Y., 472, it is stated “The test is whether to the mind of an intelligent man, the tenor of the article and the language used naturally impute a criminal or disgraceful charge.” In Ryckman v. Delevan, 25 Wend., 186, Senator Verplanck cites with approval the language of Judge Sutherland, in 3 Com., 231: “The inquiry is not whether the words could have been understood in any other way, but whether that *80 is the construction which common people naturally put upon them. If the words were óf doubtful signification it is the province of the jury to determine in what sense they are used.”
The cases are uniform in holding that if the words used are capable of a construction which will make them actionable it presents a question for the jury, even though they are also capable of an innocent construction. It is only when the language is incapable of a construction injurious to the plantiff that the court is justified in withholding it from the jury. Sanderson v. Caldwell, 45 N. Y., 400. Patch v. Tribune Association, 38 Hun, 368; Purdy v. Rochester Printing Company, 96 N. Y., 372; Townshend on Slander and Libel, § 28.
The assertion of a libe* eitner by insinuation, irony, question or allusion, is the same as if asserted directly in terms. (Folkhards Starkie on Slander and Libel, 181 and 183. Gibson v. Williams, 4 Wend., 320.)
In the light of these authorities it seems clear that the language of the publication is susceptible of an actionable construction. The whole article shows that work had been done by the plaintiff for which he had been paid, or his bill audited, and that such work was mean, dirty, sneaking work, not in a slight, but in a superlative degree, and that the plaintiff was capable of it. It needs no argument to prove that publishing of a man that he is a spy and a sneak, not alone that, but a mean and a dirty one, tends to his degradation and to bring him into contempt with his fellows. Such language in terms imputes it. If it was desired to bring contempt upon a person and disgrace him, no more forcible or apt language could be employed. The fact that the defendant states it to be but his imaginings does not change its effect. The language of the last authority cited is: “A defendant who will couch his slanders in ambiguous terms, in the hope of blasting the reputation of his neighbor, without incurring any legal responsibility, cannot claim an indulgent construction of his words either from the court or the jury.”
The second article, except as hereinafter noticed, is a reiteration of the first so far as the matter is important here. It follows, therefore, that the language averred in the complaint, as to the two articles, is clearly susceptible of a libelous construction. This is scarcely contended against. The point raised by counsel goes beyond this. The claim is that the language used simply characterizes plaintiff’s business, describes it; that, if there be anything in the article which tends to bring plaintiff into discredit, it is on account of the business which he holds himself out to perform. In other words; that he advertises himself as being at the head of a *81 prying and sneaking business, and the article only states that he did in his line for the board of health what he advertised and held himself out to do. If such is the necessary construction of the article, then the demurrer should be sustained. The allegation in the complaint upon this subject is: “ That at all the times herein mentioned, the said plaintiff was, and now is, the proprietor of a detective police bureau in the city of Buffalo, and engaged in the business of a private detective, and was of good name and credit as such detective.” It is upon this allegation that the court is asked to hold, and take judicial notice, that spying and sneaking is the advertised business of a “private detective.” In this view we do not concur.
The word “detect,” as defined by Webster, is “to uncover; to find out; to bring to light; as to detect a crime, a criminal, or his hiding place.” Its synonyms are “to discover, to find out, lay open, expose.” Detective is defined by the same authority as a person “ fitted for or skilled in detecting; employed in detecting, as detective police; a policeman whose business is to detect rogues by adroitly investigating their haunts and habits.” Detect, the act, is thus seen to mean the finding out and bringing to light that which is concealed and covered up. He who advertises himself as a detective is presumed skilled. This implies experience, by reason whereof the person becomes more competent by habit and knowledge of rogues, to be better able to thwart their evil designs or bring them to justice for the commission of crime. The literal thing understood by the word detective in common affairs, is a person who is able and has the facilities to detect criminals with a skill not possessed by non-professionals. The only distinction readily apparent between a public and private detective is that one is engaged by the public for the protection of society, the other is engaged by individuals for private protection, but the class of work which each performs is the same in their respective spheres of operation.
It frequently becomes necessary for the benefit of the public that offenses against morals of the most low and debasing kind must be suppressed. This cannot be done without evidence. The office of a public detective is to procure it. How? By secret watching, lying in wait, shadowing individuals of both sexes, spying, and yet the doing of this is legitimate and lawful, and the individual does not thereby forfeit the respect of the community or suffer degradation. On the contrary, a faithful officer frequently receives the encomiums of the public and commensurate reward for such service. The public detective does this, too, for pay. Yet it can hardly be claimed that mean and dirty *82 spying and sneaking would properly characterize the performance of such public duty or be descriptive of it. Sneak is defined by Webster to be, “to creep or steal away privately; to withdraw meanly, as a person afraid, or ashamed to be seen, as to sneak away from company. To behave with meanness, servility, to crouch, to truckle. To hide, especially in a mean and covertly manner. A mean, sneaking fellow.” And “sneaking” is thus definedr “Marked by cowardly concealment; deficient in openness- and courage: mean, servile; crouching.” The bare statement of the definition is all sufficient to answer the claim made. The most indulgent construction of the language of the article permissible would be that the defendant used it in the sense of keeping concealed, or withdrawing from view to avoid being seen, and this was all that was intended. It is an old authority which says: “It would be strange to say, and more so to give out as the law of the land, that a man should be allowed to defame in one sense- and defend himself by another.” Van Vechten v. Hopkins, 5 Johns., 211.
The coupled meaning implies cowardliness, servility and meanness, thus leaving it a question of fact as to the sense1 in which the words were used. It is possible, perhaps, to* give the language an innocent construction, but it, also,, clearly implies attributes of character which tend to make a man contemptible and disgrace him in the eyes of the1 community. But we are asked to hold that there is such a distinction between a public and private detective, as-that the business of the latter clearly implies all that the articles can be construed to mean. We are cited to no authority which warrants such holding. As an original proposition we are not prepared to adopt it. It may be true, and doubtless is that there are private detectives and public ones, too, to whose methods of business the language will apply in all its severity and still fail of aptly-describing them, or their meanness and degradation. But in a degree, the same may be said of members of almost any business and profession. What may apply to an individual may fall short of or exceed what is fairly applicable to a class. The allegation here is that the plaintiff was of good name and credit as a private detective. He could not be such and the language of the article be true. It is not strained to say that a detective of good repute and credit implies a faithful, upright, honorable man, the converse of all that a sneak implies. With his clients he must be scrupulously honest. Secrets of the most important and delicate character are instrusted to his keeping. Upon his-fidelity often depends the ruin or vindication of his employer. He is required to be courageous to act for the in *83 terests which he represents often in the absence of his principal. He must be frank, open, honest with those who intrust business to his care. If the plaintiff is of the character alleged in the complaint then he possesses substantially these attributes. Can it be contended for an instant then, that he and his business can be honestly characterized as mean and dirty, spying and sneaking ? To ask the question is to answer it. Such a designation tends to bring him into contempt, to degrade and disgrace him, and if untrue is a most scandalous libel. The argument, therefore, cannot be upheld.
The remaining portion of the second article, already adverted to, after reiterating the paragraph which has been the subject of discussion, states, “a sober reading of this paragraph may convince the liberal advertiser that he has squandered some of his questionable gains under a misapprehension.”
This paragraph tends to cast suspicion upon the legitimacy of the sources of the plaintiff’s earnings. They are “ questionable,” therefore dishonest and suspicious. If by this statement it is meant to charge dishonesty upon the plaintiff, and I think it susceptible of that construction, then it is libelous, and defendant should be called upon to answer.
The only remaining question is as to the third article, which is headed “ Byrne’s Boodle.” The claim is, that taken as a whole the article conveys the meaning that the use of the word in its present connection means that the money secured by virtue of the service rendered the board of health by the plaintiff, was criminally received, and that such is the recognized meaning of the word. The use of this word has for sometime had a more or less well-defined meaning, depending upon the connection in which it appears, and has usually been applied to designate the money held to be paid, or paid as a bribe for corrupt official action, and has mostly arisen in connection with the corruption of legislative action, although not limited to it. Its meaning may be said to be as broad as the use of money for any corrupt purpose but mostly confined to acts of an official character.
The defendant claims, however, that the word has no such fixed significance; as the court can say it imputes proper or improper action, and that if it has a disparaging meaning, its meaning should have been alleged.
It is enough to say upon the latter proposition that the articles as a whole are to be construed together, and if by giving the words their ordinary signification, they can be construed to be libelous, the allegation is sufficient. Sanderson v. Caldwell, 45 N. Y., 398.
*84 An article is libelous which imputes in slang terms dishonest or dishonorable conduct. Folkhard’s Starkie oh Slander and Libel, sec. 182; Digby v. Thompson, 4 B. and Adolph, 821.
“Either the word is a known word in the language in which case we must construe it, or it is a cant, slang phrase, the meaning of which is a matter of fact,” per Brawwell, J.
If the word used is not clear in itself, proof may be given to show its meaning and how it was understood. Wachter v. Quenzer, 29 N. Y., 547.
It follows that the necessary construction of the articles clearly shows that they are susceptible of an actionable construction. The demurrer is, therefore, overruled with costs, with leave to defendant to answer in twenty days on the payment of costs
Beckwith, C. J.
The issue of law presented for our judgment arises on a demurrer to the complaint. The complaint is founded on three articles which were published by the defendant in the newspaper of which he is the proprietor and editor. The proposition raised by the demurrer is that the three articles taken together, according to their fair purport, are not defamatory.
The subjects of comment in the three publications were the fact of the employment by the board of health of Col. Byrne’s private detective agency and the payment of his bill for services, said to have been $397.15, by the common council. The first article was an editorial animadverting with some severity upon the conduct of the board of health in engaging the services of private detectives. ■ The ground of criticism of the action of those official bodies was that the city had a large police force under pay, at large expense to the taxpayers, and that there was no excuse for the employment of private detectives. The occasion, namely, the employment of private detectives at large expense while the city had in its service a large force of salaried detective officers, was sufficient to justify the defendant’s strictures upon the action of the board of health and the common council, and fully warranted all that the defendant published in the way of an indignant demand for an explanation of the reasons for such employment and expenditure. The defendant had a right to discuss freely the conduct of those public bodies and also the acts of the plaintiff so long as his undertaking and contract for public services brought him within the scope of any just criticism of the conduct of the public officers.
It is not the policy of the law to put constraint upon the press in the discussion of matters of public concern. In *85 our day the newspaper, though conducted by private enterprise and by individuals who are not possessed of any official capacity, is yet largely the recognized organ of the public. The people look to it for information upon whatever subjects relate to the common welfare, including the exposure of public wrongs. The editor of a newspaper may, therefore, with at least as much freedom as the ordinary citizen, discuss the official conduct of public officers and with as much severity of terms as his judgment may approve. It is contended on behalf of the defendant that the publications in question did not exceed the limits allowed by the settled law for such discussions. On the other hand the plaintiff claims that the closing paragraph of the first editorial was a lateral, irrelevant and unwarranted reflection upon his private character, calculated to bring him into contempt and to disgrace him as a private detective to his injury, and that it was defamatory. The editorial, after speaking of the impropriety of hiring private detectives while the city had under pay a large police-detective force, closes with the following paragraph : '* There may be an explanation. The only decent one we can ourselves imagine (and that is hardly half decent), is that the respected gentlemen of the board of health wanted something done in the line of spying and sneaking, meaner and dirtier than they had the face to ask the police department to do, and so they went to Col. Byrne.”
The plaintiff claims that this language was not within the range of a fair criticism of the conduct of the public officers and his connection with them, and that it was calculated to disgrace him in the minds of readers and to give the impression that he is willing as a detective to perform services that reputable men would not undertake. On the other hand, counsel for the defendant insist that the words of the paragraph do but truly characterize the essential quality of the services and the nature of the vocation of a private detective, and that the use of words expressing any grade of such services cannot be libelous, because, though in their ordinary sense, words of reproach and contempt, yet in such connection they but express the nature that inherently belongs to the duties of the office of a private detective, and rather indicate a degree of service which approaches perfection in the detective art. And the learned counsel for the defendant urges with apparent sincerity that the court ought to take judicial notice of the nature of the business of a private detective, and that the words complained of are merely technical descriptions of what belongs to the business and not the man, and that, therefore, the court ought to hold as a matter of law that the words are not defamatory. Men in many avocations, as *86 surgeons, physicians, nurses, builders, plumbers, scavengers, and even lawyers, and persons in every condition are at times called upon to perform tasks that would be degrading if they were not legal and necessary. Yet it would hardly be libelous to say of a man in one of these vocations that he would perform in his line a worse job than another. The court would probably take notice that private detective agencies are generally a combination or association of men who keep an office and advertise to do detective work for pay, and the experience of the courts might possibly enable them to take notice further that men under no accountability to authority, working in secret and the dark, might, for pay, at times, from the frailty of human nature, enter upon the performance of services of a questionable character. It was said recently by the supreme court (Moller v. Moller, 9 N. Y. State Rep., 800) that the testimony of private detectives ought to be scrutinized with vigilant distrust, which I take to be a recognition of this latent infirmity in the composition of men and the extreme liability of persons under the inducement of reward to go beyond the bounds of honorable conduct in pursuit of their objects. But the court cannot say as a matter of law that all men yield to this infirmity, and even if one may speak of the business of a private detective as a business “in the line of spying and sneaking,” still the court cannot say, osa matter of law, that the conditions and constraints of that business are so inexorable that every man in the business will, for pay, do things “meaner and dirtier” than the official police would undertake.
If the experimental knowledge of society has been that way so universally as to justify a conclusion that there is no work so mean and dirty that * a private detective will not enter upon it for pay, it must be a conclusion to be reached by a jury from their experience and the proofs, and not by the court. And it would seem, therefore, to be a question for the jury whether the words complained of, taken in connection with the entire context of the publication, were likely by their proper face and meaning to bring the plaintiff into contempt and injure him in his reputation as a private detective. The complaint alleges that the plaintiff was at the time of the publication in good repute as a private detective, which the defendant by demurring admits, and which admission, as counsel suggested in the argument, the plaintiff’s record as former superintendent of the police and his personal character doubtless confirm.
The second article published, referring to the “ extracts/’ that the plaintiff has caused to be advertised, says that the plaintiff has squandered his “questionable gains,” and the *87 third article, bearing the caption, “Byrne’s Boodle,” calls attention to the fact of the payment of his bill for “alleged” services, and to the fact that another bill before that for ‘ ‘alleged ” services had been paid by the common council, and declares that the board of health had no power to engage such services, and admonishes the public that by watching the proceedings of the common council many political schemes would be discovered, and suggests that “it is about time these high-handed, irregular and extravagant practices of public officials be stopped and the guilty parties summarily dealt with.”
I do not concur in the opinion that these two articles taken together, as they must be since they are so counted upon, are libelous per se, or that the court can say, as a matter of law, that they are defamatory. They are comments on the action and conduct of public officials in paying the public moneys to plaintiff for services alleged to have been performed for the public on the hiring of the board of health, the writer claiming that the board had employed the plaintiff improvidently and without authority of law. The author was at liberty in good faith to express his opinion on those subjects, whether right or wrong, and inasmuch as the plaintiff, when he contracted with the board of health, was bound to take notice of their powers, the writer had the right to insist and to urge with relevant language that the payment of the bill of the plaintiff’s services was unauthorized and irregular. It might be argued at least plausibly that the reference to “questionable gains,” and the heading “Byrne’s Boodle,” whatever the words may ordinarily purport, were by the context of the article, plainly limited in meaning, so that an intelligent reader would understand them as referring to nothing more than the sum of money paid to the plaintiff, as claimed by the writer, improperly, if not illegally.
Whether these words or the other words speaking of the detective’s business being in the line of spying and sneaking, and the suggestions of the reason why the board of health employed the plaintiff were uttered wrongfully, were irrelevant and outside the line of just and proper comment and tended to injure the plaintiff in his credit and good name as a detective, is a proper question for the. jury.
I concur in the conclusions reached by my associates that the demurrer must be overruled; but Í concur only on the ground that the court cannot say, as a matter of law, that the published articles are defamatory.
All concur in the result.